ALEXANDER TOTH, Plaintiff-Appellee, v. MARSHA ENGLAND, Defendant-Appellant.

Fifth District    No. 5—02—0402

Opinion filed March 17, 2004.—Motion to publish granted April 27, 2004.—Rehearing denied June 2, 2004.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Karen J. Dimond, Assistant Attorney General, of counsel), for appellant.

Bill T. Walker, of Granite City, for appellee.

JUSTICE MAAG delivered the opinion of the court:

The plaintiff, Alexander Toth, Jr., filed a small claims complaint against the defendants, Marsha England and the Southwestern Illinois Visiting Nurses Association (Association), England's employer, for defamation, abuse of process, and malicious prosecution. The defendants filed a motion to dismiss, and the circuit court denied the motion. The defendants filed a motion to reconsider. The record does not reflect any ruling on that motion. Subsequent to the trial, the circuit court entered an order that dismissed the Association as a defendant, and the court entered a judgment in favor of the plaintiff and against England in the amount of $5,000 plus costs. England filed a timely notice of appeal.

The relevant facts are as follows. The plaintiff filed a small claims complaint against the defendants on July 23, 2001, alleging defamation, abuse of process, and malicious prosecution. The plaintiff did not

state what actions the defendants had taken that supported his claim. For that reason, the defendants filed a motion to dismiss pursuant to section 2—619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2—619(a)(9) (West 2000)), contending that they were entitled to sovereign immunity, to public official immunity, and to immunity pursuant to the Elder Abuse and Neglect Act (Elder Act) (320 ILCS 20/1 *et seq.* (West 2000)). The circuit court denied the motion on September 24, 2001. A few weeks later, the defendants filed a motion to reconsider the denial of their motion to dismiss. In that motion, the defendants argued that England was a State of Illinois employee pursuant to the Elder Act and that she was acting in the course of her employment. The defendants alleged that the plaintiff's cause of action was barred by sovereign immunity and that England was protected by public official immunity. A review of the record shows no ruling on the motion to reconsider. The case proceeded to a trial.

The testimony at the trial revealed that the Association became involved with the Toth family because Florence Toth, who was 81 years old with a history of Alzheimer's dementia, was living at home with her husband, Alexander Toth, Sr. (Toth Sr.), who was approximately the same age as Mrs. Toth and serving as her primary caregiver. The plaintiff is the Toths' only child. For various reasons, the Association intervened to provide assistance to the family.

Peggy Riley, Mrs. Toth's senior companion, testified in her evidence deposition that she worked for the Toth family for six months in 2000. She stated that she noticed bruising on Mrs. Toth's body during that period of time. Riley said that one day while sitting with Mrs. Toth she noticed a "humongous" bruise on Mrs. Toth's breastbone when Toth Sr. was changing her blouse. Riley claimed that there were always "fingerprint bruises" on Mrs. Toth's arms, as if someone were "squeezing [her] too hard." She also noticed a bruise on Mrs. Toth's lip. She was concerned when she noticed the bruises, and she asked Toth Sr. about them. Toth Sr. claimed that Mrs. Toth fell a lot. Riley thought that was strange because she and Mrs. Toth went outside, down the steps, on the patio, and down the driveway when she visited with her twice a week, and she had never seen Mrs. Toth fall. Riley stated that she did not hold onto Mrs. Toth or help her.

On October 2, 2000, Riley noticed that Mrs. Toth was not sitting at the kitchen table as she normally did. When she entered the Toth home, she could hear Toth Sr. "hollering" at Mrs. Toth. They were in the bathroom. Riley thought that Toth Sr. had shoved Mrs. Toth, because when Mrs. Toth exited the bathroom she was "almost at the point of running." Mrs. Toth then "plopped down in the chair." Mrs. Toth's eyes were glazed and she had a "very blank look on her face."

She was "trembling." Mrs. Toth was unable to communicate with Riley. Riley said that this was unusual for Mrs. Toth. Toth Sr. told Riley that Mrs. Toth had "messed" on herself. Toth Sr. exited the bathroom and threw some crackers on the table. Toth Sr. told Mrs. Toth that the crackers would be the only thing that she would get to eat that day. Riley picked up the cracker and Mrs. Toth "ignored it." Riley suggested to Toth Sr. that they call an ambulance to take Mrs. Toth to the hospital. Toth Sr. told Riley that it was "too expensive." The telephone rang, and it was the plaintiff. Riley told the plaintiff about the incident between Toth Sr. and Mrs. Toth. The plaintiff responded, "[W]ell, [D]ad does that sometimes." She told the plaintiff that she was concerned about getting Mrs. Toth to the hospital and that Toth Sr. did not want to call an ambulance. The plaintiff talked to Toth Sr. for a few seconds on the telephone, and Toth Sr. then called an ambulance. Riley stated that Toth Sr. made no effort to do anything for Mrs. Toth while they were waiting for the ambulance to arrive.

Riley also testified that Toth Sr. did not give Mrs. Toth enough food. Mrs. Toth was losing weight. Riley stated that she brought it to Toth Sr.'s attention and nothing changed. Toth Sr. complained if Riley turned a light on to read to Mrs. Toth; he said it made his electric bill more expensive. Riley also claimed that one day she played a radio for Mrs. Toth and that Toth Sr. told her to turn it off because she was running the batteries down. Riley basically stated that these incidents were examples of how Toth Sr. generally conducted himself.

Eileen Brewer, the elder abuse trainer and coordinator for the Illinois Department on Aging (Department), testified that the purpose of the elder abuse program is to receive reports of any type of abuse, neglect, or financial exploitation of a senior citizen who lives in a domestic setting. Brewer stated that the Department then intervenes in substantiated cases. According to Brewer, her employer, the Association, is the designated elder abuse agency for the seven counties in southwestern Illinois, pursuant to the Elder Act. See 320 ILCS 20/1 et seq. (West 2000). Additionally, the State of Illinois provides the Association's training. The caseworkers must attend caseworker certification training, supervisor training, community care training, documentation training, and in-service training throughout the year. Brewer stated that England received such training. She also said that England is listed on the registry for caseworker and supervisor. Brewer agreed that England had received intervention training, which included seeking orders freezing the assets of elderly clients who were believed to be financially exploited. Agencies such as the Association use attorneys to prepare the petitions to freeze assets, but no specific directions are given to caseworkers on how to serve orders freezing assets. Brewer

stated that caseworkers must act quickly in situations where an order has been entered freezing assets, in order to prevent the depletion of assets. Brewer testified that an agency employee should seek the advice of an attorney if she does not know the particular banks where the alleged victim has assets.

England testified that she is a social worker for the Association. She had worked for the Association for about 11 years. England earned a bachelor's degree in social work from "Southwestern Illinois University of Edwardsville [*sic*]" in 1990. England testified that she had received training from the Department. England described her job as an elder abuse/neglect/exploitation caseworker. She explained that she gets involved in cases where someone has made allegations of abuse, exploitation, or neglect of a senior citizen.

On August 25, 2000, England was assigned to a case involving Mrs. Toth. At that time, Mrs. Toth's primary caregiver was Toth Sr. During the course of England's investigation, she interviewed the plaintiff, Toth Sr., several medical personnel who provided care for Mrs. Toth, Riley, and Mary, who was Mrs. Toth's aide and cared for her during the week. England stated that she spoke with the plaintiff approximately seven times.

On November 15, 2000, England, on behalf of the Association, filed a petition for the guardianship of a disabled adult and a motion to freeze assets pursuant to the Elder Act. England explained that the purpose of filing the motion was to ensure that Mrs. Toth would receive the type of care that she needed. England stated that her primary concern was Mrs. Toth's safety and well-being. In the motion, England stated in part as follows:

"3. The undersigned *reasonably believes* that the client, Florence Toth[,] is the subject of financial exploitation based upon the work of myself and other members of my agency, including, but not limited to the following:

a. When our agency *** began work[ing] with Mrs. Toth in July or August 2000 she was ambulatory. She had dementia and could not speak properly. She was unable to reside in her home by herself. Her spouse[ ] Alexander Toth[ ] Sr. and her [son] Alexander Toth[ ] Jr. were unwilling or unable to pay for the necessary home health care. The spouse *** is believed to have sufficient assets and income to pay for the necessary care.

b. In August 2000 the family agreed that Mrs. Toth needed constant supervision and care. However, rather than placing her in a nursing home, the son placed her in a motel to live by herself.

c. The spouse and son have been very resistant to suggestions that they take advantage of outside services that would permit Mrs. Toth to reside in the home with the necessary care. They have been reluctant to employ outsiders.

    d. Caregivers were eventually hired to help Mrs. Toth in her home[;] however, they were discharged by the spouse on the grounds that he could not afford them.

    e. On October 2, 2000[,] the spouse grabbed Mrs. Toth after she was incontinent, leaving her with cuts and bruises and in shock. The son refused to consent to 9[-]1[-]1 being called. I believe that he was afraid that she would be taken to a nursing home or have hospital charges.

    f. The son claims to have advanced education degrees ***. *** [H]is father cannot remember any graduation ceremonies. *** Further exploration is needed regarding the possibility that the son has continued to receive money from his parents for school even though he is no longer attending." (Emphasis added.)

The motion requested that "any real or personal property owned in whole or in part *** by Florence Toth be frozen." England understood the order to freeze the combined assets of Toth Sr. and Mrs. Toth. England was unaware that the plaintiff's name was listed on some accounts with Mrs. Toth's name. Mrs. Toth and Toth Sr. had accumulated assets totaling $900,000.

The circuit court entered an *ex parte* order freezing Mrs. Toth's assets. England then took the *order*, not the motion, to all the banks in Granite City, Illinois, because she did not know where Toth Sr. and Mrs. Toth had bank accounts. She could not gather this information from Toth Sr. Although England testified that she did not ordinarily serve the order to freeze assets on banks, she had consulted with the Association and an attorney, and they approved of her serving all the local banks with the court order. When employees of the First Bank on Nameoki Road asked why they were being served with an order to freeze assets, England stated that it appeared that Toth Sr. was giving the plaintiff money. This statement was based upon information provided by Toth Sr., who stated that on a routine basis the plaintiff would come to his home for money. She stated that she did not relay this information to any other banks. Two days after the order to freeze assets was entered by the circuit court, a hearing was held before another judge, who lifted the freeze on the assets.

The plaintiff testified that he filed this case because he was "upset by the defamatory information." He claimed that he was especially upset by the allegation in the motion to freeze assets that stated that he did not want his mother to receive care. The plaintiff stated that he was also upset by the allegation that he was negligent and did not care about his mother's health status or her living conditions. The plaintiff testified that it was "very upsetting mentally *** to have those kind of allegations made[;] plus, it was a very devastating time." The plaintiff

stated that he had to pay an attorney, he was unable to proceed with work that he would have normally done, and he had "incurred further expenses." He described the reasons he filed this case: "[for the] overall devastating effect on my financial status with the expenses incurred, with my social and mental outlook, and also for the interference with my daily routine." The plaintiff said that he "felt very badly" that a statement was made in a public court document that he had abandoned his mother in a motel. He also claimed that the order freezing his mother's assets affected him since his name is similar to his father's name. The plaintiff claimed that he spent $6,151 in attorney fees. He did not testify about what legal services were rendered for these payments.

The plaintiff also claimed that he had been in weekly counseling since February 2001. At the time of his testimony in January 2002, he was continuing to see a counselor. The plaintiff did not specify what type of counseling he received, but he did state that it was not with a psychologist or psychiatrist. The plaintiff claimed that he was in counseling solely because of the motion to freeze assets. The plaintiff did not state where he was receiving counseling or how much he paid for the counseling. Additionally, he did not submit any bills or other documentation to substantiate his claims that he required counseling.

After the plaintiff rested, the defendants made a motion for a judgment on the same grounds raised in the still-unresolved motion to reconsider. The defendants argued that they were protected by sovereign immunity since England was an agent acting on behalf of the State within the scope of her employment. The defendants also claimed that England was protected by public official immunity. Finally, the defendants stated that England was immune from suit pursuant to the Elder Act (320 ILCS 20/1 et seq. (West 2000)) because she had been acting in good faith and pursuing her duties. The defendants also argued that the plaintiff had not established the requisite elements for abuse of process, malicious prosecution, or defamation. Regarding the malicious prosecution claim, the defendants argued that the plaintiff's complaint did not challenge the propriety of the defendants' filing of the underlying petition for guardianship. In fact, the defendants argued that the plaintiff objected only to certain statements made within a motion filed within that proceeding. Additionally, the defendants claimed that England had probable cause to believe that the motion to freeze assets was necessary to protect Mrs. Toth's assets. Finally, the defendants claimed that the plaintiff failed to demonstrate that England had acted with malice toward him. The defendants also contended that the plaintiff failed to plead special damages or injury. The defendants argued that with respect to the

abuse of process claim, the plaintiff had not demonstrated that they had an ulterior motive or that they had taken some act in the use of the legal process that was not proper in the regular prosecution of the proceedings. The defendants also claimed that the statements contained in the motion could not be considered defamatory *per se.* The circuit court denied the motion. We note parenthetically that even though it was error for the circuit court to fail to rule on the defendants' motion to reconsider, it was harmless error, since the same issues were raised in the motion for judgment and denied. See *Hadley v. Snyder,* 335 Ill. App. 3d 347, 352, 780 N.E.2d 316, 321 (2002) (the court determined that although the circuit court had erred by failing to rule on Hadley's motion to compel answers to O'Leary's interrogatories, the error did not affect the outcome of his case).

After hearing all the evidence, the circuit court entered an order on May 8, 2002, that dismissed the Association as a defendant, found that England had exceeded the boundaries of her employment with the Association, determined that the immunity statutes were inapplicable to England since she had exceeded the boundaries of her employment, found that England's efforts were irrelevant and unnecessary to protect Mrs. Toth, determined that there was a basis for an order of protection, and found that there was no factual basis to support England's "good faith" defense. The circuit court entered a judgment in favor of the plaintiff for $5,000. The order does not specify if the circuit court found that England had engaged in malicious prosecution, abuse of process, or defamation.

Initially, England claims that the motion to dismiss should have been granted due to the plaintiff's failure to state a claim. We disagree.

■ The rules governing small claims actions were designed to provide an expeditious, simplified, and inexpensive procedure for the handling of such claims. Supreme Court Rule 282 (177 Ill. 2d R. 282) provides that a small claims action may be commenced by filing a short and simple complaint setting forth the nature and amount of the plaintiff's claim, giving dates and other relevant information. It is not necessary to plead all the elements that are essential to state a cause of action in a small claims complaint. *Simmons v. Fox Valley Dodge,* 16 Ill. App. 3d 197, 198, 305 N.E.2d 543, 544 (1973). If a complaint in a small claims action clearly notifies the defendant of the nature of the plaintiff's claims, it states a cause of action. *Johnston v. Suckow,* 55 Ill. App. 3d 277, 281, 370 N.E.2d 650, 654 (1977).

■ In the instant case, the small claims complaint was sufficient to notify the defendants of the nature of the claim; hence, it stated a cause of action.

England also claims that she was immune from suit based upon the doctrine of sovereign immunity. We agree.

The plaintiff argues that England is not entitled to sovereign immunity because she is not a State employee.

■ The State Employee Indemnification Act (Indemnification Act) defines an "employee" as "individual representatives of or organizations designated by the Department on Aging in the performance of their duties as elder abuse provider agencies or regional administrative agencies under the [Elder Act]." 5 ILCS 350/1(b) (West 2000). Additionally, the Elder Act provides, "The Department shall establish, design[,] and manage a program of response and services for persons 60 years of age and older who have been, or are alleged to be, victims of abuse, neglect, or financial exploitation." 320 ILCS 20/3(a) (West 2000). The Department is required to contract with provider agencies for those services. 320 ILCS 20/3(a) (West 2000). Hence, the employees of the provider agencies are providing State services even though they are not paid directly by the State comptroller. Further, the Elder Act provides that the Department must approve the designation of provider agencies and "monitor the use of services, provide technical assistance to the provider agencies[,] and be involved in program development activities." 320 ILCS 20/3(b) (West 2000). Hence, the Department's regulations allow it to have control over the provider agencies. Section 270.215(c) of Title 89 of the Illinois Administrative Code (89 Ill. Adm. Code § 270.215(c) (2000)) is one of the Department's regulations. It states, in relevant part, "Designated elder abuse provider agencies are *agents* of the Illinois Department on Aging." (Emphasis added.) 89 Ill. Adm. Code § 270.215(c) (2000). Moreover, a review of the regulations (89 Ill. Adm. Code §§ 270.215(g), (h), (i), (m) (2000)) demonstrates that the provider agencies and their employees are performing the State's work pursuant to the State's direction.

The record shows that England was employed by the Association, which was designated by the Department as one of its elder abuse provider agencies. Hence, England is an "employee" pursuant to the Indemnification Act. See 5 ILCS 350/1(b) (West 2000).

■ The Illinois Constitution of 1970 abolished sovereign immunity but granted the legislature the power to restore it. Ill. Const. 1970, art. XIII, § 4. In 1971, the General Assembly reestablished sovereign immunity when it enacted the State Lawsuit Immunity Act (Immunity Act) (Pub. Act 77—1776, § 1, eff. January 1, 1972 (1971 Ill. Laws 3446-47)), which provides, "[T]he State of Illinois shall not be made a defendant or party in any court" (745 ILCS 5/1 (West 2000)) except as provided in the Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2000)) or the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2000)). Hence, lawsuits by a private citizen against the State in state court are barred by sovereign immunity unless the State's im-

munity has been waived. Where sovereign immunity applies, the circuit court is without jurisdiction to entertain the litigation. *People ex rel. Manning v. Nickerson*, 184 Ill. 2d 245, 246, 702 N.E.2d 1278, 1279 (1998). Additionally, sovereign immunity has not been confined to actions that name the State as the defendant. *Welch v. Illinois Supreme Court*, 322 Ill. App. 3d 345, 350-51, 751 N.E.2d 1187, 1192 (2001). Rather, sovereign immunity applies in an action naming a State employee as a defendant when the impact on the State makes the suit, for all practical purposes, one against the State. *Welch*, 322 Ill. App. 3d at 351, 751 N.E.2d at 1192; see *Evans v. Page*, 341 Ill. App. 3d 486, 489-90, 792 N.E.2d 805, 807-08 (2003).

■ The purpose of sovereign immunity is to protect the State from interference with the performance of governmental functions and to preserve and protect State funds. *Nickerson*, 184 Ill. 2d at 248, 702 N.E.2d at 1280. The determination of whether a cause of action is against the State depends not on the formal identification of the parties but, rather, on the issues involved and the relief sought. *Healy v. Vaupel*, 133 Ill. 2d 295, 308, 549 N.E.2d 1240, 1246 (1990). An action brought nominally against a State employee in his individual capacity will be found to be a claim against the State where a judgment for the plaintiff could operate to control the actions of the State or subject it to liability. *Currie v. Lao*, 148 Ill. 2d 151, 158, 592 N.E.2d 977, 980 (1992). If an action seeks compensation for past harm and monetary damages, the claim has the potential to control the State's actions or may subject it to liability and must be brought in the Court of Claims. *Robb v. Sutton*, 147 Ill. App. 3d 710, 713, 498 N.E.2d 267, 271 (1986).

In the instant case, even though the circuit court did not find, and the plaintiff did not allege in the circuit court, that England breached a duty that all individuals owe to each other rather than one that she owed by virtue of her State employment, the plaintiff now argues that England is not protected by sovereign immunity because she breached a duty that she owed to the public generally, independent of her State employment. We disagree.

■ A State employee is not immunized by sovereign immunity for his own acts of negligence merely because he was acting within the scope of his employment. The proper inquiry is to analyze the source of the duty the employee allegedly breached. *Currie*, 148 Ill. 2d at 158-59, 592 N.E.2d at 980. Where the alleged negligent act arose out of the State employee's breach of a duty that is imposed on him solely by virtue of his State employment, sovereign immunity will bar the action. *Currie*, 148 Ill. 2d at 159, 592 N.E.2d at 980. Where a State employee acting within the scope of his employment is charged with breaching a duty that arose independently of his State employment,

sovereign immunity will not apply. *Currie*, 148 Ill. 2d at 159, 592 N.E.2d at 980.

For example, claims based on the negligent operation of an automobile by a State employee are generally outside the doctrine of sovereign immunity. *Currie*, 148 Ill. 2d at 160, 592 N.E.2d at 980. "The reasoning underlying this rule is apparent: negligence that arises from the ordinary operation of a motor vehicle is based on the breach of the duties every driver owes to every other driver." *Currie*, 148 Ill. 2d at 160, 592 N.E.2d at 980-81. In *Currie*, a State trooper crashed into the plaintiff while driving the wrong way down a one-way street in a nonemergency situation that was out of the primary jurisdiction of the State trooper. The plaintiff's complaint alleged that the State trooper had been negligent in operating his vehicle the wrong way on a one-way street, in failing to maintain a proper lookout, and in failing to maintain control over his vehicle, among other allegations. The court found sovereign immunity inapplicable, concluding that the duty the State trooper was charged with breaching arose not as a result of his employment but rather as a result of his status as the driver of an automobile on a public roadway. However, in some circumstances, a State employee's manner of operating a vehicle may be so unique to his employment that a lawsuit aimed at his negligent driving could operate to control the actions and policies of the State. *Currie*, 148 Ill. 2d at 160, 592 N.E.2d at 980. In *Campbell v. White*, 207 Ill. App. 3d 541, 566 N.E.2d 47 (1991), a law enforcement officer, while engaged in the high-speed chase of a suspect, crashed into the suspect's vehicle, causing the suspect's death. Sovereign immunity applied because the officer was operating a motor vehicle in a manner uniquely related to his government employment, because only officers were authorized to engage in high-speed chases. See also *Hickey v. Huber*, 263 Ill. App. 3d 560, 635 N.E.2d 791 (1994) (sovereign immunity applied to a wrongful-death suit where the decedent had been killed in an automobile collision with a State trooper who was pursuing a bank robbery suspect). In *Kostopoulos v. Poladian*, 257 Ill. App. 3d 95, 628 N.E.2d 628 (1993), the plaintiff was injured when the defendant, an Illinois Department of Transportation (IDOT) highway maintenance worker assigned to a crew patching potholes, stopped his vehicle in a lane of highway traffic without giving proper warning, thereby causing the plaintiff's vehicle to collide with the defendant's vehicle. The appellate court concluded that sovereign immunity would apply because an IDOT employee's "driving and stopping a backup truck on the highway is unique to road repair work and, therefore, to defendant's State employment." *Kostopoulos*, 257 Ill. App. 3d at 101, 628 N.E.2d at 632.

Likewise, the filing of a motion to freeze assets is uniquely related

to England's employment with the Department, and the allegations contained within the motion were based upon England's reasonable belief as a Department social worker.

To support his claim that England was acting outside the scope of her duties and is not entitled to sovereign immunity, the plaintiff cites the *O'Connor v. Smith*, 49 Ill. Ct. Cl. 153 (1996), decision. In *O'Connor*, the Court of Claims held that the duty not to libel was not a duty that arose from a State official's employment; hence, the circuit court had jurisdiction to hear the case. However, in *Wozniak v. Conry*, 288 Ill. App. 3d 129, 135, 679 N.E.2d 1255, 1260 (1997), the court held that an action brought by an associate professor against the department head for tortious interference with an employment contract was barred by sovereign immunity. Wozniak claimed that his suit was not against the State because the department head's statements regarding him did not arise out of a duty imposed solely by virtue of the department head's employment. Wozniak claimed that the department head's statements arose out of a duty imposed on the general public not to interfere with others' contractual relationships. The *Wozniak* court rejected his arguments, reasoning that a suit against a State employee controls the State's actions when the relief sought would limit the ability of the employee to engage in lawful activity on behalf of the State. The court determined that limiting a supervisor's ability to make statements regarding an employee's work-related conduct would control the actions of the State. The court stated: "It does not matter if, as here, the plaintiff alleges the statements were knowingly false. [Citation.] Instead, the relevant inquiry is whether the supervisor would be acting within the scope of his duties by making truthful statements of the general type alleged." *Wozniak*, 288 Ill. App. 3d at 133-34, 679 N.E.2d at 1258.

The case at bar is exactly the type of action where sovereign immunity bars the action. England is a social worker who is working on behalf of the State's elderly people when she has reason to suspect abuse, neglect, or exploitation. There is no doubt that England would be acting within the scope of her duties by making truthful statements of the general type alleged. That is precisely one of her job duties. The threat of private suits against the Department's social workers for work-related statements about family members who abuse, neglect, or exploit the elderly affects the way the social workers communicate and make decisions on behalf of the Department. In fact, the State could abandon financial intervention on behalf of the elderly for fear of suits against employees of its provider agencies. See *Wozniak*, 288 Ill. App. 3d at 133, 679 N.E.2d at 1258. Accordingly, when a social worker that is acting on behalf of the Department is sued by another

for work-related statements, the suit necessarily threatens to control the actions of the State. England has absolutely no obligation to investigate elder abuse claims on her own as a citizen of the State of Illinois. It is only by virtue of England's employment with the Association that she has any obligation to investigate such cases. In fact, Brewer testified that England received intervention training that included seeking orders freezing assets. Brewer claimed that the social workers must act quickly in these situations. Brewer did not indicate that it was improper for a caseworker to serve all the local banks with such an order if the caseworker did not know where the senior citizen banked. In fact, in this case, the court directed the Association to send a copy of the November 15, 2000, order "to all banks and financial institutions where Mrs. Toth *may* have any of her assets." (Emphasis added.) England even stated that she discussed the motion to freeze assets with an attorney. The fact that England did not often encounter situations such as the one in the case at bar does not mean that it was not within her normal duties as the plaintiff suggests.

For the foregoing reasons, England was entitled to sovereign immunity, and this court has no jurisdiction of this case. For this reason, we will not address any of the remaining contentions of error. We reverse the portion of the circuit court's order that entered a judgment in favor of the plaintiff and against England on the basis that England is immune from suit based on the doctrine of sovereign immunity, and we affirm the portion of the circuit court's order that dismissed the Association as a defendant.

Reversed in part and affirmed in part.

DONOVAN and KUEHN, JJ., concur.