2020 IL App (1st) 190904

THIRD DIVISION
September 9, 2020

No. 1-19-0904

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| MARIANNE GIOVENCO-PAPPAS, Individually and as Guardian of the Person and Estate of Rosemary Giovenco, ) | |
| ) | Appeal from the |
| Plaintiff-Appellant, ) | Circuit Court of |
| ) | Cook County |
| ) | |
| v. ) | 15 CH 12484 |
| ) | |
| MATTHEW BERAUER, PATTY KEHL and THE ) | Honorable |
| KENNETH YOUNG CENTER, a Not-for-Profit ) | Robert E. Senechalle Jr., |
| Corporation, ) | Judge Presiding |
| ) | |
| Defendants-Appellees. ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs sued a private "provider agency" and two of its social workers, working under contract with the Illinois Department on Aging, for their alleged negligent investigation of an allegation of elder abuse. Before trial, defendants asserted the defense of sovereign immunity.

¶ 2    The court agreed that sovereign immunity barred this lawsuit and dismissed the matter for lack of subject-matter jurisdiction. We likewise agree that defendants' alleged misconduct were actions of the State and thus protected by sovereign immunity. We affirm the judgment.

¶ 3                         BACKGROUND

¶ 4    In 1998, Rosemary Giovenco (Rosemary) suffered a traumatic brain injury after she was involved in a car accident. This injury caused significant neurological disability and required her

to be placed in adult guardianship. Plaintiff Marianne Giovenco-Pappas, Rosemary's daughter (Marianne), was appointed as her mother's guardian in 2000. At all relevant times, Judge Carolyn Quinn, a judge in the Circuit Court of Cook County, oversaw Rosemary's guardianship.

¶ 5    Although Rosemary was significantly disabled, she was able to communicate in a limited manner, walk (with the assistance of a walker), and provide basic care for herself such as dressing, cooking, and eating. Although she had some expressive language, as result of the 1998 injury, in Marianne's words, "when someone tries to communicate verbally with Rosemary[,] she turns her head and makes a wincing, grimincing [*sic*] face[,] especially when she is nervous, interacting with strangers, or any disruption of her normal routine." This "is not an expression of pain, fear, or negativity."

¶ 6    In late 2014, Rosemary underwent knee replacement surgery. During the rehabilitation on her knee, she developed a methicillin-resistant staphylococcus aureus (MRSA) infection in her skull. This infection had a devastating effect on Rosemary's cognitive abilities. "Because of the MRSA infection Rosemary cannot walk; she is incontinent and wears diapers, she cannot speak and is non-verbal." After extended treatment and rehabilitation for the MRSA infection, Rosemary was able to return to Marianne's care sometime in the middle of 2015.

¶ 7    On August 8, 2015, while serving dinner, Marianne noticed that Rosemary's right hand and wrist had become swollen and red and was warm to the touch. There were also "2 small blister like areas on the dorsal aspect of her right hand." As the family ate dinner, Marianne become increasingly concerned about her mother's hand. She called 911, and the emergency responders took Rosemary to St. Alexius Hospital in Hoffman Estates (Hospital). The Hospital's emergency room physician diagnosed Rosemary with cellulitis, a skin infection. Because this infection required treatment with two potent antibiotics, Rosemary was admitted. After her

admission, she came under the care of Dr. Gopal Rao. Dr. Rao also diagnosed Rosemary's hand condition as cellulitis. Rosemary received the antibiotic treatment and was scheduled for discharge on August 12.

¶ 8     The Hospital is within the service area of The Kenneth Young Center (KYC). KYC is a "provider agency," selected by the Illinois Department of Aging (Department) to receive and assess reports of alleged or suspected abuse, neglect, or financial exploitation of the elderly. KYC, as a provider agency, is tasked with assisting the Department in administering a protective services program for the elderly in Illinois. See 320 ILCS 20/3 (West 2014). These provider agencies "are agents of the Illinois Department on Aging." 89 Ill. Adm. Code 270.215(c), amended at 39 Ill. Reg. 2156 (eff. Jan. 23, 2015). To accomplish their work on behalf of the Department, provider agencies may assign caseworkers to investigate allegations of elder abuse. Defendants Matthew Berauer and Patty Kehl are two of KYC's caseworkers.

¶ 9     The day before Rosemary's scheduled discharge, a Hospital social worker, Paul Kutylo, reported his suspicion that Rosemary was the victim of neglect or abuse to KYC. Kutylo specifically reported a suspicion that Marianne had burned Rosemary's hand. The KYC investigation was assigned to Berauer.

¶ 10     The same day that Kutylo reported his suspicions, Berauer began his investigation. He reviewed some of Rosemary's medical records and interviewed Rosemary. While interviewing Rosemary, Berauer noted that she would grimace when he mentioned Marianne. Specifically, when he asked Rosemary if she wanted to go home, she "became tearful and curled into the fetal position." These grimaces caused him to believe that Rosemary was fearful of Marianne.

¶ 11     The next morning, the date of Rosemary's expected discharge, Berauer called Marianne. What was said during this call is highly contested. Marianne claims that Berauer told her that his

investigation had determined that Marianne had burned, abused, and otherwise neglected Rosemary. Berauer claims that he simply told her that there had been *allegations* of a burn, abuse, and neglect. According to Marianne, she was shocked by these allegations, especially since no doctor had diagnosed a burn. Later that day, Marianne went to the Hospital and met with Berauer. Their accounts of that meeting differ, but ultimately, after speaking with both Marianne and Rosemary, Berauer still had concerns about the allegations of abuse.

¶ 12     Berauer's response to his investigation is also hotly contested. Most notably, Marianne contends that Berauer refused to allow Rosemary to be discharged into Marianne's care. Instead, Marianne claims that Berauer, personally, cancelled Rosemary's August 12 discharge and ordered her to be discharged to a subacute rehabilitation facility. The record is clear, and even Berauer admits, that Berauer did not possess the authority to cancel Rosemary's discharge.

¶ 13     From his perspective, Berauer did not cancel or order anything. His deposition testimony on this point is difficult to follow, but he claims that he only made *recommendations* about Rosemary's discharge. Kutylo testified that Berauer did not cancel Rosemary's discharge—the Hospital did, because its policy was not to discharge a patient into a potentially harmful environment. In an affidavit, Dr. Rao states "[t]hat on August 12, 2015, Matthew Berauer advised me that he cancelled my order discharging Rosemary Giovenco on August 12, 2015." Dr. Rao "believe[d] that [Berauer] had the power and authority to take that type of action as an Adult Protective Service Worker."

¶ 14     Rosemary remained in the Hospital until August 16. On August 16, Rosemary was transferred from the Hospital to the Glenview Terrace Nursing Center. Dr. Rao signed the discharge to the nursing center "because [he] believed that Matthew Berauer, as an Adult Protective Service Worker, had the power and authority to require [him] to take those actions."

The Glenview nursing center was outside the "jurisdiction" of KYC, and thus, Rosemary's file was transferred to the North Shore Senior Center, another provider agency.

¶ 15   On August 18, Marianne, through her lawyer, faxed a letter to Kehl, complaining about Berauer's handling of the investigation. This letter specifically contends that the medical records directly refuted Berauer's "claims." This letter demanded the immediate release of Rosemary into Marianne's custody and threatened a lawsuit otherwise. Within hours of reading Marianne's demand, Berauer sent a letter, addressed to Judge Quinn, recommending that the court appoint a guardian *ad litem* (GAL) over Rosemary's estate. The same day, Judge Quinn appointed Ruben Garcia as Rosemary's GAL.

¶ 16   Garcia investigated the claims that Rosemary was being abused. On August 24, he issued his report to Judge Quinn. Garcia's investigation did not find any evidence of abuse or neglect. The only "negative" result was that "[Rosemary] was able to communicate with [Garcia] that she would like to have more attention and more care at her daughter's house. [Rosemary] communicated to me that she believes that she is sometimes left alone for longer periods of time than she likes." Ultimately, the court dismissed the GAL and allowed Marianne to remain as Rosemary's guardian.

¶ 17   The day after the GAL was appointed, August 19, Rosemary filed this action, seeking an injunction requiring defendants to immediately release Rosemary into Marianne's custody. (Note that Marianne sued both in her individual and official capacities, so as a litigant, we will refer to her in the plural "plaintiffs.") Due to developments that occurred after the initial filing, plaintiffs made numerous amendments to the complaint. The complaint at issue on appeal, the verified fifth amended complaint, no longer sought injunctive relief. Instead, plaintiffs made 24 claims arising from defendant's handling of the investigation into the allegations of elder abuse,

including negligence, false imprisonment, intentional inflection of emotional distress, defamation, and false light.

¶ 18   The circuit court declined to dismiss the complaint on the merits, and the case proceeded toward trial. As the trial date was approaching, defendants filed a "trial brief regarding sovereign immunity." Recognizing that sovereign immunity implicated its subject-matter jurisdiction, the trial court construed the brief as a motion to dismiss. The court ordered briefing and allowed argument on the issue of sovereign immunity.

¶ 19   The circuit court concluded that sovereign immunity applied. Although plaintiffs argued that defendants "exceeded their authority," the court determined that "there simply are not allegations in this complaint that either Mr. Berauer or Ms. Kehl exceeded their authority in a way that would take this case outside of the protections in the immunity statute of sovereign immunity." Instead, the court believed the allegations were that Berauer made "mistakes in judgment." The court noted its

> "serious concern in this case were the Court to find that the sovereign immunity didn't protect Mr. Berauer as an elder abuse case worker, when it's such a difficult, difficult task, particularly in a situation like this, where time is very short, things are happening fast, and his job, at least until he can get his arms around the issue, is to protect the person that is his responsibility."

¶ 20   The court dismissed the case, and plaintiff moved to reconsider. In its written order on reconsideration, the court declined to reconsider the decision that the claim was barred by sovereign immunity. However, the court also made specific determinations about the effect and applicability of other immunity statutes, specifically the State Lawsuit Immunity Act and the qualified-immunity provision of the Adult Protective Services Act.

¶ 21    Plaintiffs timely appealed.

¶ 22                              ANALYSIS

¶ 23                                 I

¶ 24    Sovereign immunity implicates a court's subject-matter jurisdiction. *Leetaru v. Board of Trustees of the University of Illinois*, 2015 IL 117485, ¶¶ 41-42; *Currie v. Lao*, 148 Ill. 2d 151, 157 (1992). Thus, the circuit court construed the defendants' "trial brief" on sovereign immunity as a section 2-619 motion to dismiss for lack of subject matter jurisdiction. See 735 ILCS 5/2-619(a)(1) (West 2014) (authorizing dismissals for lack of subject matter jurisdiction). We review a dismissal for lack of subject-matter jurisdiction *de novo*. *Leetaru*, 2015 IL 117485, ¶ 41.

¶ 25    The 1970 Illinois Constitution abolished sovereign immunity " '[e]xcept as the General Assembly may provide by law.' " *Parmar v. Madigan*, 2018 IL 122265, ¶ 19 (quoting Ill. Const. 1970, art. XIII, § 4). The General Assembly reinstituted sovereign immunity for the State via the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2014)). See *Leetaru*, 2015 IL 117485, ¶ 42.

¶ 26    The State Lawsuit Immunity Act states that, except as provided in various statutes, including the Court of Claims Act, the State "shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2014). The Court of Claims Act, in turn, establishes a court with exclusive jurisdiction to hear most matters against the State. 705 ILCS 505/8 (West 2014). For example, "[a]ll claims against the State founded upon any law of the State of Illinois or upon any regulation adopted thereunder by an executive or administrative officer or agency" (*id.* § 8(a)) and "[a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit" (*id.* § 8(d)).

¶ 27    Whether an action is "against the State," thus implicating sovereign immunity, does not depend on the formal identification of the parties "but rather on the issues involved and the relief sought." *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990). A plaintiff cannot avoid sovereign immunity simply by filing "an action against the state's servants or agents when the real claim is against the state itself." *Swanigan v. Smith*, 294 Ill. App. 3d 263, 269 (1998); see *Healy*, 133 Ill. 2d at 308. As to the issues raised, "an action is against the state when there are:

'(1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State ***.' " (Internal quotation marks omitted.) *Jinkins v. Lee*, 209 Ill. 2d 320, 330 (2004) (quoting *Healy*, 133 Ill. 2d at 309).

Regarding the relief sought, a court must consider whether "a judgment for the plaintiff could operate to control the actions of the State or subject it to liability." *Currie*, 148 Ill. 2d at 158.

¶ 28    Plaintiffs do not deny that defendants here would qualify as State actors who ordinarily would be entitled to sovereign immunity. And rightly so. In *Toth v. England*, 348 Ill. App. 3d 378, 380-82 (2004), sovereign immunity barred a suit against a private nursing association (and one of its employees, England) that provided care to the plaintiff's elderly mother pursuant to a contract with the Illinois Department on Aging. The plaintiff sued the defendants for defamation, abuse of process, and malicious prosecution for filing a petition for guardianship of the plaintiff's disabled mother. *Id.* at 379.

¶ 29    We held that the nursing association and its employee, England, though private actors, were acting as agents of the State. *Id.* at 386. First, the State Employee Indemnification Act's

definition of "employee" included an " 'individual representative[ ] of or organizations designated by the Department on Aging.' " *Id.* (quoting 5 ILCS 350/1(b) (West 2000)). And the enabling statute, the Elder Abuse and Neglect Act (the predecessor to the Adult Protective Services Act applicable here), provided (as it still does today) that the Department on Aging may implement the Act through provider agencies. *Id.*; see 320 ILCS 20/3 (West 2014). Likewise, under the applicable administrative rules, "the provider agencies and their employees are performing the State's work pursuant to the State's direction." *Toth*, 348 Ill. App. 3d at 386; see 89 Ill. Adm. Code 270.215, amended at 39 Ill. Reg. 2156 (eff. Jan. 23, 2015) (providing for control and coordination over provider agencies).

¶ 30　We reasoned that "[t]he case at bar is exactly the type of action where sovereign immunity bars the action. England is a social worker who is working on behalf of the State's elderly people when she has reason to suspect abuse, neglect, or exploitation." *Toth*, 348 Ill. App. 3d at 389. "Accordingly, when a social worker that is acting on behalf of the Department is sued by another for work-related statements, the suit necessarily threatens to control the actions of the State." *Id.* at 389-90.

¶ 31　*Toth* was well-reasoned and, in our view, correctly decided. And as noted, the provisions of the Adult Protective Services Act and the applicable administrative rules that underlay our conclusion in *Toth* are in substantially the same form today. Thus, there can be no question—nor do plaintiffs raise one—that defendants here were acting as agents of the State in providing care, which ordinarily would trigger sovereign immunity's bar.

¶ 32　But plaintiffs argue that their lawsuit fits within an exception to sovereign immunity— when the complained-of actions of the State agent exceed his or her authority under state law. See, *e.g.*, *Jinkins*, 209 Ill. 2d at 330 (sovereign immunity applies when, among other things, there

are "no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts" (internal quotation marks omitted)); *Parmar*, 2018 IL 122265, ¶ 22; *Leetaru*, 2015 IL 117485, ¶ 45; *Healy*, 133 Ill. 2d at 309. The reason for this exception is that "conduct taken by a State officer without legal authority strips the officer of his or her official status." *Parmar*, 2018 IL 122265, ¶ 22; see also *Leetaru*, 2015 IL 117485, ¶¶ 45-46.

¶ 33 Plaintiffs say that, in two different ways, their complaint adequately alleged that defendant Berauer exceeded his authority as an investigator. First, he allegedly overrode a physician's order to discharge Rosemary, something everyone (including Berauer) agrees he lacked the authority to do. And second, he wrote that letter to Judge Quinn, requesting the appointment of a guardian *ad litem* for Rosemary.

¶ 34 The trial court ruled that these allegations are not of the sort that would typically constitute a State officer "exceeding" his or her authority for the purposes of this exception to sovereign immunity. We are likewise skeptical. Even if Berauer did these things (he denies the first allegation), and even if he acted improperly in doing so, he was doing them in furtherance of his State work, and any duty he breached was a duty he owed *only by virtue of the State work* he was performing. See, *e.g.*, *Leetaru*, 2015 IL 117485, ¶ 47 ("not every legal wrong committed by an officer of the State will trigger" this exception; exception is aimed "at situations where the official is not doing the business which the sovereign has empowered him or her to do or is doing it in a way which the law forbids"); *Jackson v. Alverez*, 358 Ill. App. 3d 555, 561 (2005) ("Because sovereign immunity presupposes the possibility of a legal wrong by a state employee [citation], and legal wrongs are, *per se*, unauthorized, the relevant question cannot be whether the employee had authority to commit the legal wrong. Instead, the question is whether the employee

intended to perform some function within the scope of his or her authority when committing the legal wrong."); *Currie*, 148 Ill. 2d at 159-60; *Toth*, 348 Ill. App. 3d at 387-88.

¶ 35 But that analysis is not always straightforward, and as discussed below, we can resolve this matter on a far simpler ground. So for the sake of argument, we will assume, without deciding, that the complaint here adequately pleaded that Berauer exceeded the authority delegated to him by the State in allegedly overriding the physician's discharge order and in penning a letter to a circuit judge seeking a guardian for Rosemary.

¶ 36 This exception to sovereign immunity for State officers who exceed their authority, and thus are not truly acting on behalf of the State when they commit their wrongful acts, is interchangeably styled the "officer suit exception" or the "prospective injunctive relief exception." (Internal quotation marks omitted.) *Parmar*, 2018 IL 122265, ¶ 22. While the former moniker is more popularly used (*id.*), the latter one previews why plaintiffs here cannot avoid the bar of sovereign immunity, regardless of the sufficiency of their allegations. A suit against an officer or agent of the State may avoid the sovereign-immunity bar only if the lawsuit seeks to *enjoin future conduct* by the State agent. *Id.* ¶ 26 ("a complaint seeking damages for a past wrong does not fall within the officer suit exception to sovereign immunity"); *Ellis v. Board of Governors of State Colleges & Universities*, 102 Ill. 2d 387, 395 (1984) (tenured professor's suit for damages for wrongful discharge was barred by sovereign immunity; court recognized that if plaintiff instead "seeks to enjoin a State officer from taking future actions in excess of his delegated authority, then the immunity prohibition does not pertain"); *Leetaru*, 2015 IL 117485, ¶ 51 (lawsuit not barred by sovereign immunity because "[plaintiff's] action does not seek redress for some past wrong" but, rather, "seeks only to prohibit future conduct *** undertaken

by agents of the State in violation of statutory or constitutional law or in excess of their authority").

¶ 37    Here, plaintiffs do not seek to enjoin defendants' future conduct. Their complaint only seeks monetary damages for past actions of State agents that allegedly constituted negligence, false imprisonment, intentional inflection of emotional distress, and various forms of defamation. The "officer suit exception" to sovereign immunity does not apply. The bar of sovereign immunity remains.

¶ 38    The trial court thus correctly dismissed the action for lack of subject-matter jurisdiction.

¶ 39                                        II

¶ 40    We briefly address two final issues raised by plaintiffs.

¶ 41                                        A

¶ 42    First, plaintiffs claim that we should not apply the sovereign-immunity bar in the State Lawsuit Immunity Act (745 ILCS 5/1 (West 2014)). Instead, they say, we should apply the more specific immunity provision in section 4(b) of the Adult Protective Services Act, which provides that any person or agency that reports or investigates a claim of elder abuse "in good faith" shall have "immunity from any civil, criminal or other liability in any civil, criminal or other proceeding." 320 ILCS 20/4(b) (West 2014). Plaintiffs say this provision is more specific than the general grant of immunity in the State Lawsuit Immunity Act, and thus the more specific law should control over the general one. See *Moore v. Green*, 219 Ill. 2d 470, 480 (2006) ("Where a general statutory provision and a more specific statutory provision relate to the same subject, we will presume that the legislature intended the more specific provision to govern.").

¶ 43    But the doctrine of applying the more specific statute over the general has no application here, because the sovereign-immunity statute and the immunity provision in the Adult Protective

- 12 -

Services Act are addressing two fundamentally different things. See *Janes v. Albergo*, 254 Ill. App. 3d 951, 956 (1993) ("sovereign immunity and public official immunity are two separate doctrines"); *Campbell v. White*, 207 Ill. App. 3d 541, 548-49 (1991) (same). Indeed, other than the word "immunity," these two concepts share nothing in common.

¶ 44     Sovereign immunity protects the State from being hauled into court in the first place. Just as the State Lawsuit Immunity Act plainly says: With a few exceptions not relevant here, "the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2014). It speaks not to liability but to the court's jurisdiction. See *Parmar*, 2018 IL 122265, ¶ 20; 705 ILCS 505/8(a) (West 2014) (Court of Claims "shall have *exclusive jurisdiction* to hear and determine *** [a]ll claims against the State founded upon any law of the State of Illinois" (emphasis added)). It is immunity from suit—in a court, at least—not immunity from liability. Indeed, as just noted, the State remains potentially liable for its agents' misconduct, subject to the constraints of the Court of Claims Act.

¶ 45     In contrast, other "immunity" provisions based on statute or the common law allow defendants to avoid *liability* for their wrongful conduct, but they are not barriers to suit. A public-official immunity provision, like section 4(b) of the Adult Protective Services Act, may make it difficult or impossible to obtain a damages award against a particular defendant, but a circuit court may still hear the case. A tort-immunity statute may insulate a municipality from liability or impose a higher burden to impose such liability, but those provisions do not prevent the bringing of a lawsuit in the first place.

¶ 46     These sort of immunity statutes are not jurisdictional in nature. See *Janes*, 254 Ill. App. 3d at 957. In fact, unlike subject-matter jurisdictional objections, which can never be forfeited and may be raised at any time (*In re M.W.*, 232 Ill. 2d 408, 414-15 (2009)), the defense of

immunity from liability may be forfeited if not asserted (*Henrich v. Libertyville High School*, 186 Ill. 2d 381, 387-88 (1998)).

¶ 47    All of which is to say that sovereign immunity and public-official immunity are neither overlapping nor antagonistic. Subject-matter jurisdictional questions like sovereign immunity will always predominate in court; if there is no subject-matter jurisdiction, the case is over. But if subject-matter jurisdiction exists, a defendant remains free to assert any defense like public-officer immunity. And for that matter, if a case in court is dismissed based on sovereign immunity, a defendant remains free to assert an immunity defense, like section 4(b) of the Adult Protective Services Act, before the Court of Claims. See *Campbell*, 207 Ill. App. 3d at 555.

¶ 48                                    B

¶ 49    Finally, plaintiffs challenge other rulings by the trial court. Given the court's lack of subject-matter jurisdiction, this matter—at least in the courts—is at an end. There is no need for us to individually examine each of these other orders. But because this dispute may find its way to the Court of Claims, we will say this much: These other challenged orders—and indeed, all orders entered below, other than the one dismissing the case for lack of subject-matter jurisdiction—are void, as the circuit court lacked the inherent power to enter them. See *M.W.*, 232 Ill. 2d at 414 (if court lacks subject-matter jurisdiction, "any order entered in the matter is void *ab initio*").

¶ 50                              CONCLUSION

¶ 51    The judgment of the trial court is affirmed.

¶ 52    Affirmed.

- 14 -

**No. 1-19-0904**

| | |
|---|---|
| **Cite as:** | *Giovenco-Pappas v. Berauer*, 2020 IL App (1st) 190904 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CH-12484; the Hon. Robert E. Senechalle Jr., Judge, presiding. |
| **Attorneys for Appellant:** | John J. Pappas Sr. and Stephen J. Healy, The Pappas Law Group, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | John W. Patton Jr. and James A. Garfield, of Patton & Ryan LLC, and Melinda S. Kollross and Paul V. Esposito, of Clausen Miller P.C., both of Chicago, for appellees. |