**2015 IL 117485**


# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

————————————

(Docket No. 117485)

KALEV LEETARU, Appellant, v. THE BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS *et al.*, Appellees.


*Opinion filed April 16, 2015.*


JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Thomas and Kilbride concurred in the judgment and opinion.

Justice Burke dissented, with opinion, joined by Justices Freeman and Theis.


**OPINION**

¶ 1        Kalev Leetaru, a graduate student at and former employee of the University of Illinois, brought this action in the circuit court of Champaign County to enjoin the Board of Trustees (Board) of the University of Illinois (University) and Howard Guenther, one of its associate vice chancellors, from taking further action in connection with an investigation they are pursuing against him, in his status as a student, regarding allegations that he engaged in misconduct which violated the University's "Policy and Procedures on Academic Integrity in Research and Publication." Leetaru seeks to halt the proceedings on the grounds that in conducting their investigation, defendants have failed to comply with the University's rules and regulations governing discipline of students and that

defendants' actions thereby exceeded their lawful authority, are arbitrary, and have resulted in a gross injustice and deprived him of due process.

¶ 2 Defendants moved to dismiss pursuant to section 2-619(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(1) (West 2012)), claiming that exclusive jurisdiction over this matter lay in the Court of Claims. The circuit court agreed and dismissed Leetaru's cause of action for lack of jurisdiction. The appellate court affirmed. 2014 IL App (4th) 130465. We granted Leetaru's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013). For the reasons that follow, we now reverse and remand to the circuit court for further proceedings.

¶ 3                                     BACKGROUND

¶ 4 Where, as here, a cause of action is challenged through a motion to dismiss under section 2-619 of the Code of Civil Procedure, all well-pleaded facts in the complaint must be accepted as true and all reasonable inferences that may arise from those facts must be drawn in favor of the nonmoving party. *Bjork v. O'Meara*, 2013 IL 114044, ¶ 21. According to Leetaru's complaint, he is a doctoral student in the University of Illinois Graduate School of Library and Information Science and a former employee of the University's Cline Center for Democracy (Cline Center or the Center), where he held the title of Coordinator of Research and Information Technology.

¶ 5 In January of 2011, Leetaru was notified by the director of the Cline Center, Peter Nardulli, that his employment there would cease the following January "for budgetary and performance issues." The following November, approximately six weeks before his job was scheduled to end, Leetaru was placed on administrative leave by the director. The formal basis given for that decision was that Leetaru had failed to disclose the location of data belonging to the Cline Center and had used the Center's data without authorization. The director told Leetaru, however, that the real purpose for his actions was to suspend Leetaru's research program, cause Leetaru's research funding to be rescinded, provide the director and the Center with unrestricted access to Leetaru's research in order to further the director's own research and publication activities, and to keep Leetaru from conducting research which the director considered to be in competition with the work of the Center.

¶ 6     Once Leetaru was placed on administrative leave, a dean at the University barred him from his office and blocked his access to all personal and professional documents and objects he kept there, including personal computers, hard drives, USB drives, multiple CD-ROMs of data and paper folders. Among these items, which were seized and boxed by the University, were numerous documents and data related to Leetaru's graduate studies, including his doctoral research and dissertation materials. Leetaru also lost access to certain supercomputing sites around the country.

¶ 7     On December 6, 2011, Leetaru received written notice of the charges which were the predicate for his having been placed on leave from his job. While those charges were pending, but after the January termination date for Leetaru's employment with the Cline Center had passed, the Center's director wrote to University Associate Vice Chancellor for Research Howard Guenther to express his continuing concerns regarding Leetaru's actions as a Center employee, specifically, "misappropriation of data from a long term project that has been directed, funded and operated" by the Center.

¶ 8     Shortly thereafter, on February 8, 2012, Guenther sent notice to Leetaru in Leetaru's status as a graduate student, that his office had received a formal research misconduct complaint alleging that Leetaru was responsible for the unauthorized removal of a substantial number of articles from a University-affiliated repository and had failed and refused to disclose the location of the missing information or return the relevant files despite being asked to do so repeatedly. Although the written notice did not identify the source of the complaint, Guenther advised Leetaru that the complaint had been made by the Cline Center's director.

¶ 9     The University has promulgated and published policies, rules and regulations governing the investigation and discipline of graduate students. These are set out in the "University of Illinois Policy and Procedures on Academic Integrity in Research and Publication" (Policy and Procedures) and the bylaws of the "Graduate College Handbook" (Bylaws), which is "the administrative home of students admitted to graduate studies at the University of Illinois at Urbana-Champaign." Both documents were appended to Leetaru's complaint and incorporated therein.

¶ 10    The Bylaws, along with the state statutes establishing the University, define such matters as how the Graduate College is organized and how it conducts its

affairs. With respect to academic integrity, the Bylaws specify that "[a]ll charges of academic integrity infractions with respect to organized research activities against students in the Graduate College will be dealt with as prescribed in the [Policy and Procedures]," subject to certain exceptions. The Policy and Procedures, in turn, "incorporate[ ] federal regulations and guidelines of the U.S. Public Health Service" and "prescribe[ ] procedures for impartial fact-finding and fair adjudication of allegations of academic and Research Misconduct."

¶ 11    The process mandated by the Policy and Procedures contains three stages, "Assessment," "Inquiry" and "Investigation." In stage one, assessment, a "Unit Executive Officer" (UEO) and a "Research Integrity Officer" (RIO) are required to make an initial assessment as to whether the complaint against a student falls within the definition of "Research Misconduct" as set forth in the Policy and Procedures, whether the complaint is credible and whether it is sufficiently specific to enable potential evidence supporting the complaint to be identified. The Policy and Procedures provide that "[t]he [a]ssessment period should be brief, preferably concluded within 15 calendar days."

¶ 12    Unless it is determined that a complaint clearly falls outside the scope of the Policy and Procedures, the complaint and assessment findings must be brought to the attention of the relevant dean. Within 15 days of having a complaint brought to his or her attention, the dean is required to decide whether sufficient evidence exists to warrant moving to the next stage, inquiry. If the dean decides that an inquiry should be conducted, the dean must then appoint an inquiry team comprised of two qualified, unbiased individuals with no potential or actual conflicts of interest in the matter. When feasible, these are to be tenured faculty members, one for the unit in which the conduct in question occurred and the second from elsewhere in the University. The dean may also appoint a third faculty member or academic professional to the team. In addition, the Bylaws of the Graduate College call for the Graduate College's dean to appoint to the inquiry team a qualified, unbiased graduate student who has no conflict of interest.

¶ 13    The RIO, after consultation with the dean and the UEO, is required to prepare a charge for the inquiry team which (1) sets forth the time for completion of the inquiry; (2) describes the allegations against the student; (3) explains that the purpose of the inquiry is to make an initial review of the evidence and determine whether an investigation is warranted; (4) sets forth the two criteria which must be met in order to warrant an investigation, namely, that (a) there is a reasonable basis

to conclude that the complaint falls within the definition of research misconduct and is "within the jurisdictional criteria" of the Policy and Procedures and (b) that it may have substance; and (5) informs the inquiry team members that they are responsible for preparing or directing the preparation of a written report of the inquiry.

¶ 14        Before the inquiry begins, the RIO is required to make a good faith effort to notify the student, in writing, that the inquiry is being undertaken. Once the inquiry team has been selected, the RIO must send the student a letter setting forth the allegations, including a copy of the Policy and Procedures. The letter must advise the student of various rights he or she has and admonish the student that failure to provide research records on request may be considered evidence that research misconduct occurred. Sequestration provisions also take effect. The RIO, in consultation with counsel for the University, is required to "undertake reasonable and practical steps to secure all research records and other evidence needed to conduct a [r]esearch [m]isconduct proceeding, to inventory those materials, and to sequester them in a secure manner." However, "[w]henever practicable, the [student] may request and shall upon request be given copies of, or reasonable supervised access to, sequestered research records."

¶ 15        According to the Policy and Procedures, the inquiry process should normally involve interviews of the person who filed the complaint, the student against whom the complaint was lodged, and the key witnesses; examination of relevant research records and materials; consultation with experts in the field; and such other steps as may be appropriate. After evaluating the evidence and then consulting with the RIO, the inquiry team then makes a recommendation as to whether the matter should proceed to stage three, investigation. The team must tender its report to the relevant vice chancellor for research (VCR), with a copy to the RIO, within 60 days after the student received written notice of the inquiry. The RIO, in turn, is required to deliver a copy of the report to the dean, the student, and other appropriate parties. Time extensions may be granted, but they must be tendered to the chancellor in writing, and the request for more time must set forth the length of the extension requested and the reason for the request.

¶ 16        Within 10 calendar days of receiving the inquiry team's report and any written responsive comments from the student, the VCR "shall determine whether to order an [i]nvestigation, close the case, or take other appropriate action ***." If the VCR decides to order an investigation, the third and final stage in the process, the student

must be notified in writing of the allegations to be investigated. The notice must be provided to the student within 30 calendar days after the VCR determines that an investigation is warranted, but before the investigation actually commences. The RIO must also furnish the student with a letter containing a written charge and a list of the student's rights during the investigation process.

¶ 17    Within 15 calendar days of notifying the student of the investigation, the VCR, in consultation with the RIO, is required to appoint a three-person investigation panel, "each of whom shall be a tenured faculty member or an academic professional." No one who served on the inquiry panel can also serve on the investigation panel, and the student is given the opportunity to object to a panel member on the ground that the person fails to meet the qualifications for panelist set forth in the Policy and Procedures, including that the person is biased or lacks sufficient training and experience to understand and judge the allegations against the student. After receiving its charge from the VCR, the panel undertakes its investigation and, within 90 days after its first meeting, presents a written report to the RIO. The RIO, in turn, submits the report to the VCR, and the VCR transmits the report to the chancellor of the University with any recommendations "for sanctions and/or corrective actions." The chancellor makes the final decision regarding disposition of the case. The chancellor "is the final adjudicator of all allegations of [r]esearch [m]isconduct *** subject only to an appeal to the President [of the University] on procedural grounds."

¶ 18    As previously noted, Leetaru was notified that a complaint had been lodged against him in a letter written by Guenther and dated February 8, 2012. Guenther's letter advised Leetaru that the complaint against him would be handled in accordance with the Policy and Procedures as summarized above. A link to an internet site containing that document was included in the notice. Leetaru was given until February 20, 2012, to respond.

¶ 19    Guenther wrote to Leetaru again on February 17, 2012. This second letter notified Leetaru that sequestration guidelines contained in the aforementioned Policy and Procedures had been activated. It further advised Leetaru that his access to computer files and directories, specifically, the I-CHASS project at the National Center for Supercomputing Applications at the University and the National Institute for Computational Sciences and the Extreme Science and Engineering Discovery Environment, was being suspended.

¶ 20    On February 20, 2012, Leetaru, through counsel, responded to the research misconduct complaint lodged against him by the Cline Center's director earlier that month. The response, addressed to Guenther, protested that, notwithstanding the terms of the Policy and Procedures, Leetaru had been denied access to any paper or electronic data that might aid in his defense, that all the paper files from Leetaru's office had been placed in the custody of the very person who had initiated the charge, and that no inventory of the paper documents had been made. The response requested confirmation that all data, paper and electronic, had been sequestered under Guenther's control as the Policy and Procedures required. The response also asked that the charges be dismissed and that Leetaru's property be returned to him.

¶ 21    On February 24, 2012, the Center's director provided Guenther with a more detailed written description of the basis for the research misconduct complaint he had filed. In that document, the director stated repeatedly that Leetaru was positioning his GlobalNet project to be a direct competitor to the Cline Center's SPEED project and that Leetaru's GlobalNet data products were in direct competition with the Cline Center's SPEED project for grants and other purposes. During the pendency of the proceedings, this document was not furnished to Leetaru, nor was he given an opportunity to respond to the claims made in the document.

¶ 22    Sometime that same day, February 24, Guenther, in his capacity as RIO, met with the UEO and a person from the Graduate College named Kopera, and the three of them concluded that, in their view, the charges fell within the definition of research misconduct, were credible and were sufficiently specific to enable potential evidence of research misconduct to be identified. No further action was taken at that time, however, and the matter remained in the assessment stage.

¶ 23    Approximately two months later, on April 26, 2012, an associate director of the Center wrote Guenther and others regarding Leetaru. The letter stated that "at this point, we only have a listing of file names, and I am assuming that we need to have firmer evidence than this in order to assess the University's next steps in dealing with [Leetaru]." It also included a detailed listing of the issues which the University had with Leetaru. According to the pleadings, these issues centered on Leetaru's employment with the Cline Center and had nothing to do with his status as a graduate student.

¶ 24      While the assessment was still underway, the chancellor of the University approved the appointment of Barbara Wilson, a vice provost for academic affairs, to serve as a substitute for the dean with respect to the proceedings against Leetaru. Wilson met with Guenther, the UEO and Kopera on April 27, 2012, and discussed the allegations against Leetaru. Four days later, on May 1, 2012, Wilson issued a determination that the matter should proceed to the next stage, inquiry.

¶ 25      Leetaru did not learn of Wilson's decision until September 14, 2012, when Guenther notified him by email that an inquiry would be initiated. Guenther's email set forth the specific matters that would be investigated. These included allegations that Leetaru had done the following:

> (1) misappropriated news archives, web crawler data, scripts, digitized images and other computer files from projects that had been directed, funded, and operated by the Cline Center and misled Center personnel about the existence of that material;

> (2) copied a significant number of news archives and computer files for which the Center was responsible without the Center's knowledge or approval to an Extreme Science and Engineering Discovery Environment (XSEDE) associated with the National Institute for Computational Sciences at the University of Tennessee Knoxville/Oak Ridge National Laboratory;

> (3) copied a significant number of news archives and computer files for which the Center was responsible without the Center's knowledge or approval to various other locations;

> (4) implemented the Center's main web crawler operation on the EnterpriseWorks' server without the Center's knowledge or approval and then subsequently stored the processed data on the I-CHASS server;

> (5) ignored formal requests to disclose the location of the missing news archives and computer files, and failed to return these materials when requested to do so;

> (6) falsely reported his credentials in his online resume, presentations, proposals and correspondence;

(7) utilized the Center's news archives, web crawler data, scripts, digitized images and other computer files in the development of GlobalNet, which was then used to compete with the Center's projects in grant applications;

(8) utilized the Center's news archives and computer files in at least one scholarly publication without attribution or approval; and

(9) provided false and misleading statements to University officials in response to the initial allegations.

¶ 26    After outlining the allegations, Guenther's email advised Leetaru of the individuals who would be undertaking the inquiry, a group which included Guenther. The notice explained that Leetaru could submit a written objection if he believed that any of those individuals had some potential or actual unresolved personal, professional, or financial conflicts of interest with any party or witness; was biased; or lacked appropriate qualifications to evaluate the matters at issue. The notice explained the process which would be followed, admonished Leetaru of his obligation to fully cooperate in the proceedings, and advised him of his responsibility to provide evidence, information and materials, and to maintain confidentiality. It also informed him that he was entitled to consult with appropriate University committees and private legal counsel; to submit a written response to the charges and have his comments provided to the investigative team to accompany its report; and to be notified of the outcome of the investigation and get a copy of the investigative report.

¶ 27    Leetaru, through his attorney, responded to the notice by challenging the University's authority to undertake the inquiry, demanding that the inquiry be stopped, objecting to the composition of the investigatory team, requesting that a graduate student be added to the team in accordance with the Bylaws, and asserting that the investigation was retaliatory in nature. Leetaru's response also included his own written remarks in answer to each of the nine charges outlined in the inquiry notice.

¶ 28    Following Leetaru's response and objections, a graduate student was added to the inquiry team, then later replaced with a different graduate student after Leetaru complained that the first student had a conflict. Leetaru was then given additional time to challenge the composition of the inquiry team. Before that deadline expired, the inquiry team proceeded with its work. Without requesting or conducting an

interview with Leetaru, the team subsequently prepared and submitted its inquiry report.

¶ 29    The report, written by Guenther on behalf of the inquiry team, was dated November 12, 2012. It found that there was a reasonable basis for concluding that the allegations against Leetaru met the definition of research misconduct under the University's Policy and Procedures; that allegations 1, 2, 3, 5, 6, 8 and 9 might have substance and warranted a full investigation; and that allegation 4 should be examined further. The report also recommended that the University pursue an allegation that Leetaru had provided false and misleading statements in response to the initial complaint and as part of the research misconduct complaint process.

¶ 30    Leetaru responded directly to Guenther. In a lengthy email, Leetaru detailed the numerous ways in which he believed those associated with the investigation had failed to comply with the applicable procedures. Leetaru wrote that "it is difficult to understand any portion of this process, which has now stretched on for more than a year, to comport with any understanding of 'due process' or 'good faith.' " In Leetaru's estimation, the process had "now become so corrupted that there is simply no process left and there is no choice but to dismiss the accusations against [him] in their entirety and to permit [the University's ethics officer] to conduct a formal investigation of misconduct by University personnel in their handling of this matter."

¶ 31    Leetaru's attorney responded separately to the University counsel's office. In his letter, Leetaru's attorney expressed his view that the University had substantially violated Leetaru's rights under its own policies and had "not pursued this matter with due process." The attorney's letter further advised counsel for the University that he would seek a temporary restraining order in the event the University decided to initiate a full and formal investigation as recommended by the inquiry team.

¶ 32    On January 3, 2013, Guenther, acting in his capacity as RIO, wrote to Leetaru to advise him that the matter would proceed to the third stage, investigation. The specific allegations that were to be investigated tracked those identified by the inquiry, specifically, the items labelled by the inquiry team as 1-6, 8 and 9.

¶ 33    The following month, Leetaru's attorney initiated this litigation by filing a complaint in the circuit court of Champaign County for preliminary and permanent injunctive relief. The complaint named as defendants Guenther and the

University's Board of Trustees. The lawsuit did not concern Leetaru's status as an employee or challenge the University's decision terminating his employment. Rather, it pertained solely to Leetaru's status as a graduate student and the threat to that status posed by the manner in which the research misconduct proceedings were being conducted.

¶ 34    Leetaru alleged that during the course of the proceedings, defendants repeatedly acted in excess of their delegated authority by violating the fundamental due process rights accorded Leetaru as a graduate student through the University's published rules, policies, bylaws and regulations. After setting out the controlling policies and procedures, the complaint described how the course of the inquiry deviated from those policies and procedures. The list was lengthy and included the following:

(1) Although the proceedings against Leetaru were directed at his status as a graduate student, the complaint and ensuing inquiry and investigation were unrelated to the research he is doing to fulfill his degree requirements. They were premised instead on conduct related to his status as an employee of the Cline Center.

(2) While the Policy and Procedures specified that the decision as to whether a complaint should move from assessment to inquiry is to be made by the dean, the decision in this case was made by the RIO and UEO together with an interim vice chancellor (Wilson) who had been substituted for the dean notwithstanding the absence of any rule authorizing other administrators to stand in for the dean in such proceedings.

(3) In addition to being made by the wrong person, the determination that the matter should move from the assessment stage to the inquiry stage was untimely. The decision to proceed should have been made within 15 days after the complaint was brought to the attention of the relevant dean. In this case, the Dean had direct or constructive notice of the complaint by late February. By Leetaru's calculations, the dean should have made a decision no later than March 9, 2012. Instead, the decision, made by the dean's substitute, did not come until May 1, 2012, making it 53 days late, and it was not communicated to Leetaru until mid-September, approximately four and a half months later.

(4) Contrary to the Bylaws, the inquiry team initially did not include any graduate student, and then, when a graduate student was appointed, the student had to be replaced due to a conflict.

(5) The Policy and Procedures provide that the inquiry team will normally interview the student under investigation. In this case, however, not only was Leetaru not interviewed, but the RIO specifically instructed the inquiry team not to contact or communicate with him.

(6) The Policy and Procedures state that the inquiry team shall prepare a written report, but the report here was prepared and submitted by the RIO, actions which, in Leetaru's view, usurped the authority of the team.

(7) The sequestration procedures set forth in the Policy and Procedures were not properly followed, depriving Leetaru of access to materials he needed to defend himself and enabling others to tamper with the data.

(8) The decision by the vice chancellor for research (VCR) that the matter should move from the inquiry stage to the investigation phase was untimely. According to the Policy and Procedures, the VCR was to make his determination with 10 calendar days of receiving the inquiry team's report and any written comments from the student and then to provide written notice to the student. By Leetaru's calculations, the VCR's deadline for these actions expired in December, 2012, but he did not receive written notice until January, 2013.

(9) Although the Policy and Procedures permit the VCR to extend any timeline or "make such other changes to these procedures as may be necessary to effectuate the purposes of this Policy or insure [a student's] right of due process," the Policy and Procedures also specify that the student is to be consulted about any such changes. According to Leetaru , he was not consulted about the deviations from the Policy and Procedures in his case.

¶ 35 Leetaru alleged in his complaint that by failing to abide by the Policy and Procedures and the Bylaws, defendants exceeded their delegated authority and violated his fundamental due process rights. He further asserted that the University's internal or administrative procedures provided no mechanism for him to compel the defendants to follow their own policies, and that in the absence of intervention by the courts, he would suffer irreparable harm "in the loss of his

ability to continue his doctoral studies, write and defend his dissertation, and be awarded a Ph.D., the loss of additional research grants beyond those already lost, the loss of his reputation and stature in the community in his field to such extent that [he] could not be fully compensated by money damages." For his relief, Leetaru asked that defendants be preliminarily and permanently enjoined from proceeding with the investigation. Leetaru did not assert that he was in any way exempt from scrutiny by the University or its Graduate School of Library and Information Science, nor did he challenge the University's right, power and duty to protect its academic integrity. His position was simply that if the University was going to investigate him for research misconduct, it should be required to carry out that investigation in accordance with the rules, policies, bylaws and regulations it had promulgated to govern such investigations.

¶ 36    Defendants responded to Leetaru's allegations by filing a motion to dismiss his cause of action for lack of subject matter jurisdiction pursuant to section 2-619(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(1) (West 2012)). Invoking the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2012)) and the Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2012)), defendants contended that this action was actually one against the State, that the State is not subject to being sued in circuit court except under circumstances not present in this case, and that exclusive jurisdiction over Leetaru's claims lay in the Court of Claims.

¶ 37    While the motion to dismiss was pending, Leetaru sought a temporary restraining order. His request was denied by the circuit court. The appellate court affirmed on interlocutory appeal in an unpublished order under Illinois Supreme Court Rule 23 (Ill. S. Ct.   R. 23 (eff. July 1, 2011)) on the grounds that denial of the temporary restraining order was not an abuse of discretion based on the information then available to the court. *Leetaru v. Board of Trustees of the University of Illinois*, 2013 IL App (4th) 130290-U.

¶ 38    Following remand from the appellate court, the circuit court took up defendants' motion to dismiss. It concluded that the motion was meritorious and therefore dismissed Leetaru's cause of action for lack of jurisdiction. Leetaru promptly appealed. Once again he was unsuccessful. The appellate court agreed that the circuit court lacked jurisdiction and affirmed its judgment dismissing the case. 2014 IL App (4th) 130465. As noted at the outset of this opinion, Leetaru then petitioned this Court for leave to appeal, which we allowed.

- 13 -

¶ 39                                              ANALYSIS

¶ 40            In undertaking our analysis, we begin by clarifying what is and is not before us. Central to this appeal is the fact that it arises from the circuit court's ruling on a motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)). A motion to dismiss under section 2-619 admits the sufficiency of the complaint, but asserts affirmative matter that defeats the claim. *Bjork v. O'Meara*, 2013 IL 114044, ¶ 21. Consistent with their decision to invoke section 2-619, defendants therefore do not and could not challenge the legal sufficiency of Leetaru's complaint. See *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 121 (2008) (to raise a challenge pursuant to section 2-619, a defendant "must admit the legal sufficiency" of plaintiff's complaint). For present purposes, defendants accept that Leetaru has stated a legally cognizable claim against them based on their failure to adhere to the Policy and Procedures and Bylaws governing discipline of graduate students at the University. Their contention is simply that Leetaru is pursuing his claim before the wrong tribunal. In defendants' view, the only body authorized by law to consider Leetaru's complaint is the Illinois Court of Claims.

¶ 41            As we have indicated, the circuit court agreed with defendants and therefore dismissed Leetaru's cause of action pursuant to section 2-619(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(1) (West 2012)) on the ground that it lacked subject matter jurisdiction. We review a circuit court's grant of a motion to dismiss based on a lack of subject matter jurisdiction *de novo. Village of Roselle v. Commonwealth Edison Co.*, 368 Ill. App. 3d 1097, 1104 (2006); see *People v. Philip Morris, Inc.*, 198 Ill. 2d 87, 94 (2001).

¶ 42            Defendants' jurisdictional challenge is premised on principles of sovereign immunity. The doctrine of sovereign immunity was abolished in Illinois by the 1970 Constitution "[e]xcept as the General Assembly may provide by law." Ill. Const. 1970, art. XIII, § 4. As it was authorized to do under this provision, the General Assembly subsequently reinstituted the doctrine through enactment of the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2012)). The statute provides that except as provided in the Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2012)) and several other specified statutes, "the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2012). *Township of Jubilee v. State of Illinois*, 2011 IL 111447, ¶ 22. The Court of Claims Act, in turn, states that the Court of Claims shall have exclusive jurisdiction to hear and

- 14 -

determine nine enumerated matters, including "[a]ll claims against the State founded upon any law of the State of Illinois or upon any regulation adopted thereunder by an executive or administrative officer or agency." 705 ILCS 505/8(a) (West 2012).

¶ 43    Leetaru's complaint does not purport to assert a claim against the State as such. Rather, it names as defendants the Board of Trustees of the University, a public corporation (110 ILCS 305/1 (West 2012)), and one of its associate vice chancellors. Defendants contend, however, that the exclusive jurisdiction provision of the Court of Claims Act should nevertheless apply because, notwithstanding the formal designation of the parties, the lawsuit actually seeks to control the actions of the State or subject it to liability and that it is therefore tantamount to an action against the State itself.

¶ 44    Defendants are correct that the formal identification of the parties as they appear in the record is not dispositive for purposes of the Court of Claims Act. In determining whether sovereign immunity applies to a particular case, substance takes precedence over form. See *Hudgens v. Dean*, 53 Ill. App. 3d 126, 129 (1977). That an action is nominally one against the servants or agents of the State does not mean that it will not be considered as one against the State itself. See *Senn Park Nursing Center v. Miller*, 104 Ill. 2d 169, 187 (1984). By the same token, the fact that the named defendant is an agency or department of the State does not mean that the bar of sovereign immunity automatically applies. In appropriate circumstances, plaintiffs may obtain relief in circuit court even where the defendant they have identified in their pleadings is a state board, agency or department. See *Landfill, Inc. v. Pollution Control Board*, 74 Ill. 2d 541, 552 (1978); *Moline Tool Co. v. Department of Revenue*, 410 Ill. 35, 37 (1951); *Rockford Memorial Hospital v. Department of Human Rights*, 272 Ill. App. 3d 751, 757 (1995); *Illinois State Employees Ass'n v. Department of Children & Family Services*, 178 Ill. App. 3d 712, 717 (1989).

¶ 45    Whether an action is in fact one against the State and hence one that must be brought in the Court of Claims depends on the issues involved and the relief sought. *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990); *Moline Tool Co.*, 410 Ill. at 37; *Senn Park Nursing Center*, 104 Ill. 2d at 186; *City of Springfield v. Allphin*, 74 Ill. 2d 117, 124 (1978); *Sass v. Kramer*, 72 Ill. 2d 485, 490-91 (1978). The prohibition " 'against making the State of Illinois a party to a suit cannot be evaded by making an action nominally one against the servants or agents of the State when the real

- 15 -

claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested.' " *Healy*, 133 Ill. 2d at 308 (quoting *Sass v. Kramer*, 72 Ill. 2d at 491). The doctrine of sovereign immunity "affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority, and in those instances an action may be brought in circuit court." *Id.* (and cases cited therein). See *S.J. Groves & Sons Co. v. State*, 93 Ill. 2d 397, 401 (1982).

¶ 46        This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not. In effect, actions of a state officer undertaken without legal authority strip the officer of his official status. Accordingly, when a state officer performs illegally or purports to act under an unconstitutional act or under authority which he does not have, the officer's conduct is not regarded as the conduct of the State. *PHL, Inc. v. Pullman Bank & Trust Co.*, 216 Ill. 2d 250, 261 (2005). A suit may therefore be maintained against the officer without running afoul of sovereign immunity principles. *Sass v. Kramer*, 72 Ill. 2d at 492; *Senn Park Nursing Center*, 104 Ill. 2d at 188.

¶ 47        Of course, not every legal wrong committed by an officer of the State will trigger this exception. For example, where the challenged conduct amounts to simple breach of contract and nothing more, the exception is inapplicable. *Smith v. Jones*, 113 Ill. 2d 126, 132-33 (1986). Similarly, a state official's actions will not be considered *ultra vires* for purposes of the doctrine merely because the official has exercised the authority delegated to him or her erroneously. The exception is aimed, instead, at situations where the official is not doing the business which the sovereign has empowered him or her to do or is doing it in a way which the law forbids. *PHL, Inc. v. Pullman Bank & Trust Co.*, 216 Ill. 2d at 266. The purpose of the doctrine of sovereign immunity, after all is to "protect[ ] the State from interference in its performance of the functions of government and preserve[ ] its control over State coffers." *S.J. Groves & Sons Co. v. State*, 93 Ill. 2d 397, 401 (1982). The State cannot justifiably claim interference with its functions when the act complained of is unauthorized or illegal. *Senn Park Nursing Center*, 104 Ill. 2d at 188.

¶ 48        For similar reasons, the courts of Illinois have consistently held that an action to enjoin the State or its agents from taking actions in excess of their authority and in violation of plaintiff's protectable legal interests does not contravene the immunity

prohibition. *Id.* at 189. Even where the nominal defendant is the State or an agency of the State, sovereign immunity will not bar the action because the action is not considered to be against the State itself. As we have explained:

> " ' "[t]he presumption obtains that the State, or a department thereof, will not, and does not, violate the constitution and laws of the State, but that such violation, if it occurs, is by a State officer or the head of a department of the State and such officer or head may be restrained by a proper action instituted by a citizen." ' *City of Springfield v. Allphin* (1978), 74 Ill. 2d 117, 124 ***, quoting *Schwing v. Miles* (1937), 367 Ill. 436, 441-42 ***." (Internal quotation marks omitted.) *Id.*

Applying these principles, this court and our appellate court have repeatedly reaffirmed the right of plaintiffs to seek injunctive relief in circuit court to prevent unauthorized or unconstitutional conduct by the State, its agencies, boards, departments, commissions and agents or to compel their compliance with legal or constitutional requirements. See *City of Springfield v. Allphin*, 74 Ill. 2d 117; *County of Cook v. Ogilvie*, 50 Ill. 2d 379, 383 (1972); *Herget National Bank of Pekin v. Kenney*, 105 Ill. 2d 405, 408-11 (1985); *Rockford Memorial Hospital v. Department of Human Rights*, 272 Ill. App. 3d at 757; *Village of Maywood Board of Fire & Police Commissioners v. Department of Human Rights*, 296 Ill. App. 3d 570, 579 (1998). This includes actions to require compliance with administrative rules and regulations, for violation of such rules and regulations is illegal. See *Farmer v. McClure*, 172 Ill. App. 3d 246, 254 (1988); *Fernandes v. Margolis*, 201 Ill. App. 3d 47, 50 (1990).

¶ 49    Under the foregoing authorities, the cause of action alleged by Leetaru in this case may proceed in circuit court without offending principles of sovereign immunity. As we have already pointed out, Leetaru does not question the right of defendants to investigate research misconduct by graduate students at the University of Illinois. That is something they clearly have authority to do in furtherance of the University's educational mission. Rather, his contention is that in investigating misconduct, defendants are legally obligated to adhere to the policies and procedures promulgated by the University governing such investigations as "set out *inter alia* in the 'University of Illinois Policy and Procedures on Academic Integrity in Research and Publication,' *** and the 'Bylaws of the Graduate College,' " and that in the numerous and various ways alleged in his complaint, they have failed and refused to do so. Defendants' alleged acts and omissions,

moreover, involve far more than a mere difference of opinion over how the rules and regulations should be interpreted or applied and are not simply the result of some inadvertent oversight or *de minimis* technical violation. Rather, according to Leetaru, they constitute a fundamental disregard for core provisions governing academic discipline at the University, thereby exceeding defendants' authority and violating Leetaru's constitutional rights to due process.

¶ 50 As noted at the outset of our analysis, by moving to dismiss under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2012)), defendants have admitted the legal sufficiency of the plaintiff's cause of action. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993); *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 121 (2008) (as modified on denial of rehearing). Whether defendants' conduct is, in fact, actionable on the grounds that it was unauthorized, illegal and in violation of Leetaru's rights is a question that defendants may pursue further following remand. For purposes of this appeal, however, it is not at issue. Because sovereign immunity affords no protection when agents of the State have acted in violation of statutory or constitutional law or in excess of their authority, which is precisely what Leetaru has alleged, Illinois precedent compels the conclusion that he was entitled to proceed in circuit court. *Fritz v. Johnston*, 209 Ill. 2d 302, 311 (2004); *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540, 548 (1977) (suit to enjoin state agent from taking actions in excess of his delegated authority and in violation of plaintiff's protectable legal interests not barred by sovereign immunity); see *Farmer v. McClure*, 172 Ill. App. 3d at 254 (action taken in violation of administrative rules is illegal and is not protected by the shield of sovereign immunity). The circuit court therefore erred when it dismissed Leetaru's cause of action for lack of subject matter jurisdiction, and its judgment should not have been affirmed by the appellate court.

¶ 51 In urging a contrary result, defendants assert that sovereign immunity principles should bar the action in circuit court because it seeks to enforce a present claim against the State and would interfere with the performance of a governmental function. This argument is untenable. Unlike cases such as *Ellis v. Board of Governors of State Colleges & Universities*, 102 Ill. 2d 387 (1984), which sought damages and other relief based on discharge of a tenured university professor, or *Healy v. Vaupel*, 133 Ill. 2d 295 (1990), which sought damages for personal injuries sustained by a gymnast during university-sponsored gymnastics activities, Leetaru's action does not seek redress for some past wrong. As we have explained, it seeks only to prohibit future conduct (proceeding with the disciplinary process)

undertaken by agents of the State in violation of statutory or constitutional law or in excess of their authority. Claims of this kind are not against the State at all and do not threaten the State's sovereign immunity. *PHL, Inc. v. Pullman Bank & Trust Co.*, 216 Ill. 2d at 261; *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d at 548.

¶ 52    On this appeal, Leetaru has advanced an alternative theory to support his right to proceed in circuit court, namely, that the General Assembly made defendants amenable to suit there when it enacted section 1 of the University of Illinois Act (110 ILCS 305/1 (West 2012)). That statute states, *inter alia*, that the Board of Trustees of the University of Illinois may sue and be sued, provided that any suit against the Board based upon a claim sounding in tort must be filed in the Court of Claims.

¶ 53    In *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d 897, 903 (1997), the Appellate Court, First District, examined section 1 and concluded that its "sue and be sued" provision constitutes an exception to the doctrine of sovereign immunity in non-tort actions that are not covered in the Court of Claims Act and that the City of Chicago could therefore rely on it as a basis for bringing an equitable action for declaratory relief against the Board of Trustees of the University of Illinois in circuit court. Invoking this authority, Leetaru asserts that because the present lawsuit is not an action sounding in tort, but rather an equitable proceeding to halt action by defendants that is alleged to be unauthorized and in violation of constitutional protections, section 1's "sue or be sued" provision should likewise permit him to proceed in circuit court.

¶ 54    The appellate court in this case rejected that argument based on *Raymond v. Goetz*, 262 Ill. App. 3d 597 (1994), an Appellate Court, Fourth District, decision which predated *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d 897. The plaintiff in *Raymond* asserted that because the University of Illinois's enabling legislation empowered it to sue and be sued, provided that tort claims against it had to be brought in the Court of Claims, then by implication contract claims against the University need not be brought in the Court of Claims but could be asserted instead in circuit court. *Raymond*, 262 Ill. App. 3d at 600. The appellate court, however, disagreed. It held that a university's enabling act was not determinative of where it could be sued and that regardless of the provisions of the enabling legislation, the proper jurisdiction for a suit against the University for breach of contract was controlled by the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2012)). Because the Act incorporated the Court of Claims Act,

which conferred exclusive jurisdiction on the Court of Claims over actions against the State for breach of contract, the appellate court concluded that the Court of Claims had exclusive jurisdiction to hear the plaintiff's contract dispute against the University. For this and other reasons, it affirmed dismissal of plaintiff's cause of action for lack of jurisdiction.

¶ 55        *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d 897, distinguished *Raymond*, 262 Ill. App. 3d 597, and similar authorities on the grounds that they involved contract or tort claims, and were inapplicable to claims such as the one before it, which asked for declaratory relief. *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d at 902-03. Leetaru argues that his claim for injunctive relief is similarly distinguishable and the appellate court in this case should therefore have followed *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d 897, rather than *Raymond*, 262 Ill. App. 3d 597.

¶ 56        We agree with Leetaru that there is analytical tension between how the appellate court viewed section 1 of the University of Illinois Act in this case and how the statute was interpreted in *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d 897. Resolution of that tension, however, must wait for another day. It is axiomatic that this court will not consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided. *People ex rel. Sklodowski v. State*, 162 Ill. 2d 117, 130 (1994) (as modified on denial of rehearing). This is just such a situation. Even if the appellate court in this case was correct and jurisdiction could not be predicated on section 1, that conclusion would not change the outcome. Leetaru is entitled to pursue injunctive relief in circuit court based on the exception to sovereign immunity set forth above.

¶ 57        Finally, plaintiff contends that he should be permitted to proceed in circuit court because a contrary conclusion would contravene article I, section 12, of the Illinois Constitution of 1970, which provides, in part, that "[e]very person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation." Ill. Const. 1970, art. I, § 12. For the same reasons just discussed, we need not address this contention either. Plaintiff's cause of action may proceed in circuit court whether section 12 would afford him protection or not. A discussion of the scope of section 12 is therefore unnecessary to the disposition.

¶ 58    We conclude by emphasizing that our decision today is premised on the particular facts alleged in this case and the specific procedural posture in which the jurisdiction of the circuit court was challenged. Our holding that plaintiff's cause of action should not have been dismissed for lack of jurisdiction under section 2-619(a)(1) is in no sense a ruling on the merits of plaintiff's cause of action. On that we express no view. Whether the conduct alleged in plaintiff's complaint is actionable as a matter of law and can be proven factually are matters that remain to be determined. Our task today was not to decide whether plaintiff had a valid claim, but merely to determine *where* that claim should be litigated. The answer to that is the circuit court.

¶ 59                              CONCLUSION

¶ 60    For the foregoing reasons, the circuit court erred when it dismissed Leetaru's cause of action for lack of jurisdiction, and its judgment should not have been affirmed by the appellate court. The judgments of the circuit and appellate courts are therefore reversed, and the cause is remanded to the circuit court of Champaign County for further proceedings.

¶ 61    Reversed and remanded.

¶ 62    JUSTICE BURKE, dissenting:

¶ 63    The majority holds that the plaintiff's complaint may go forward in the circuit court under an exception to sovereign immunity which permits lawsuits that seek prospective injunctive relief from *ultra vires* actions committed by state officials. In so holding, the majority misconstrues the scope and nature of the exception. For this reason, as well as others set forth below, I respectfully dissent.

¶ 64                              BACKGROUND

¶ 65    The plaintiff, Kalev Leetaru, filed a two-count complaint in the circuit court of Champaign County seeking preliminary and permanent injunctive relief against the

- 21 -

defendants, the "Board of Trustees of the University of Illinois, a Public Corporation,"[1] and "Howard R. Guenther, Associate Vice Chancellor for Research, University of Illinois at Urbana-Champaign, in his official capacity only." The complaint described how Leetaru, while a graduate student at the University of Illinois at Urbana-Champaign, was accused of committing various acts of misconduct including, among other things, misappropriating research material. The complaint alleged that, during the course of investigating these accusations, the University and Guenther violated various procedures that governed the school's investigation of academic and research misconduct.

¶ 66    The procedures allegedly violated by the University and Guenther were outlined in two documents: the University's "Policy and Procedures on Academic Integrity in Research and Publication" and the bylaws of the "Graduate College Handbook." In general, these documents, which were generated by the University under its enabling authority (110 ILCS 305/1 (West 2012)), set forth a three-stage process for the University to follow when investigating a complaint of academic or research misconduct.

¶ 67    In the first stage, or "[a]ssessment" stage, University officials determine whether the allegations in the complaint meet the definitions of misconduct defined in the Policy and Procedures and whether the allegations are credible. If these criteria are met, the complaint is forwarded to the appropriate University dean who then determines whether the complaint should be advanced to the second or "[i]nquiry" stage. If the complaint is advanced to the inquiry stage, an "[i]nquiry team" is appointed to further investigate the allegations. After considering the allegations in the complaint and relevant evidence, the inquiry team then makes a recommendation to the vice chancellor for research, in the form of a written report, as to whether the complaint should be advanced to the third or "[i]nvestigation" stage. If the vice chancellor for research concludes that an investigation is warranted, a three-member panel is appointed. This panel prepares a report, including any recommended disposition for the misconduct, which is then forwarded to the chancellor of the University. Ultimately, the chancellor is the final adjudicator for all allegations of research misconduct and determines the disposition of the case, including any sanctions.

---

[1] The "Board of Trustees of the University of Illinois" is the legal name of the entity commonly known as the University of Illinois. See 110 ILCS 305/1 (West 2012); *Williams v. University of Illinois*, 945 F. Supp. 163, 164 n.1 (N.D. Ill. 1996).

¶ 68    At the time Leetaru filed his complaint, the first two stages of the University's investigation had been completed. The third stage had just begun. *Supra* ¶ 32. Leetaru's complaint alleged that the University and Guenther violated portions of the Policy and Procedures and the Bylaws during the first two stages. Specifically, Leetaru alleged that defendants: allowed the determination as to whether the investigation should proceed from stage one to stage two to be made by the wrong person; failed to make a determination to proceed with a stage-two inquiry within the time limits set forth in the Policy and Procedures; excluded a graduate student from the inquiry team where the Bylaws required that one be on the team and then appointed a student who had to be replaced due to a conflict; instructed the inquiry team not to communicate with or contact Leetaru; failed to allow the inquiry team to draft the inquiry report, which was instead prepared by Guenther; failed to sequester and preserve evidence that would permit Leetaru to defend himself against the allegations of misconduct; failed to timely notify Leetaru whether the matter would proceed from stage two to stage three; and failed to consult with Leetaru regarding any variance to the required time limits for stage one and stage two.

¶ 69    Based on the foregoing allegations, Leetaru's complaint sought—in the words of the complaint itself—"to have the investigation stopped and the University enjoined from continuing the process against him." More specifically, count I of Leetaru's complaint sought a preliminary injunction to "restrain the University of Illinois and Howard Guenther in his official capacity from proceeding with the Investigation." Count II sought a permanent injunction to "restrain the University of Illinois and Howard Guenther in his official capacity from proceeding with the Investigation." See *supra* ¶ 35 ("For his relief, Leetaru asked that defendants be preliminarily and permanently enjoined from proceeding with the investigation.").

¶ 70    Defendants filed a joint motion to dismiss Leetaru's complaint under section 2-619(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(1) (West 2012)). Defendants contended that the complaint was an action against the "State of Illinois" within the meaning of the State Lawsuit Immunity Act (Immunity Act) (745 ILCS 5/0.01 *et seq.* (West 2012)), and, thus, could not proceed in circuit court. Instead, according to defendants, jurisdiction over Leetaru's complaint was vested exclusively in the Court of Claims under the Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2012)). The circuit court granted defendants' motion. The appellate court affirmed the dismissal. 2014 IL App (4th) 130465.

- 23 -

¶ 71                                    ANALYSIS

¶ 72        Prior to 1970, sovereign immunity in Illinois was a constitutional doctrine, set forth in article IV, section 26, of the Illinois Constitution of 1870. That provision stated that "[t]he State of Illinois shall never be made defendant in any court of law or equity." Ill. Const. 1870, art. IV, § 26. The Illinois Constitution of 1970 abolished sovereign immunity "[e]xcept as the General Assembly may provide by law." Ill. Const. 1970, art. XIII, § 4. Pursuant to its constitutional authority, the General Assembly reinstated sovereign immunity in the Immunity Act. 745 ILCS 5/0.01 *et seq.* (West 2012). Section 1 of the Immunity Act states that "[e]xcept as provided in the Illinois Public Labor Relations Act, the Court of Claims Act, the State Officials and Employees Ethics Act, and Section 1.5 of this Act, the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2012).

¶ 73        The Immunity Act's seemingly straightforward requirement that "the State of Illinois shall not be made a defendant or party in any court" has generated a considerable body of case law that has not always been consistent in defining those instances where the State is made a defendant in circuit court. It is necessary, therefore, to set forth the governing framework used when the statute is raised as a defense.

¶ 74        The Immunity Act may be implicated whenever a plaintiff files a direct action in circuit court which names as a defendant the State of Illinois, a state agency, department or other arm of the State, or a State employee or official. If the lawsuit names the State of Illinois as a defendant, the analysis is straightforward. Because the General Assembly has "specifically prohibited making the State of Illinois a defendant or party in any court" (*Sass v. Kramer*, 72 Ill. 2d 485, 490 (1978)), the State may claim immunity and must be dismissed from the case. The only exception to this rule is if the legislature has, through clear and unequivocal statutory language, consented to suit and waived sovereign immunity. *In re Special Education of Walker*, 131 Ill. 2d 300, 303 (1989); *People ex rel. Madigan v. Excavating & Lowboy Services, Inc.*, 388 Ill. App. 3d 554, 560 (2009). By way of example, the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2012)), which is mentioned in the Immunity Act, contains a clear and unequivocal

consent to suit in circuit court. Section 25 of that act provides, "For purposes of this Act, the State of Illinois waives sovereign immunity." 5 ILCS 315/25 (West 2012).

¶ 75     The foregoing analysis also applies to entities that are a part or arm of the State rather than a separate political unit, such as a municipality or local public entity. This is so because a lawsuit which makes an arm of the State a defendant is considered to be a suit against the State itself. *People ex rel. Freeman v. Department of Public Welfare*, 368 Ill. 505, 507 (1938) ("It is settled that a suit against a governmental agency which is a part, or division, of the State government is a suit against the State ***."); *Magna Trust Co. v. Department of Transportation*, 234 Ill. App. 3d 1068, 1070 (1992); *Swope v. Northern Illinois Gas Co.*, 221 Ill. App. 3d 241, 242 (1991) ("A suit against a department or agency of the State is considered to be a suit against the State for immunity purposes."); *Gordon v. Department of Transportation*, 109 Ill. App. 3d 1071, 1074 (1982). Questions may arise in individual cases as to whether a particular entity is properly considered part of the State or whether it is something else, and this may necessitate an examination of the nature of the entity being sued. See, *e.g.*, *Williams v. Medical Center Comm'n*, 60 Ill. 2d 389, 393-94 (1975). However, if the entity is deemed an arm of the State, it is subject to the Immunity Act and may not be made a defendant in circuit court unless there is a clear statutory waiver of the immunity.

¶ 76     A lawsuit that makes a State official or employee a defendant requires a more involved analysis. An action that is brought nominally against a State official or employee in his personal capacity avoids the literal terms of the Immunity Act because a State official or employee, when sued only in his personal capacity, is not the "State of Illinois." Nevertheless, such an action may, in certain circumstances, be subject to the Immunity Act. *Loman v. Freeman*, 229 Ill. 2d 104, 112-24 (2008). If, for example, a plaintiff suing a State employee in his personal capacity alleges that the employee negligently breached a duty sounding in tort, and that duty is "imposed on the employee *solely* by virtue of his state employment" (emphasis in original) (*id*. at 113), the Immunity Act applies. The claim may not go forward in circuit court but must be heard in the Court of Claims, the tribunal that has exclusive jurisdiction for tort claims brought against the State (705 ILCS 505/8(d) (West 2012)). See, *e.g.*, *Healy v. Vaupel*, 133 Ill. 2d 295, 311 (1990) (holding that the claimed negligence of the defendants arose solely out of the performance of their duties as employees of Northern Illinois University and, therefore, exclusive jurisdiction lay in the Court of Claims). Similarly, if an action naming a State official in his personal capacity " 'could operate to control the actions of the State

or subject it to liability' " it is considered an action against the State and may not be heard in circuit court. *Loman*, 229 Ill. 2d at 113 (quoting *Currie v. Lao*, 148 Ill. 2d 151, 158 (1992)). Treating such actions as ones against the State is necessary in order to prevent plaintiffs from circumventing the Immunity Act entirely by simply naming individual State officials and employees as defendants in their personal capacities. It is this concern that has given rise to the familiar rule that, in determining whether the Immunity Act applies, we do not look solely at the formal designation of the parties in the caption of the complaint. Rather, we consider the nature of the " 'issues involved and the relief sought.' " *Loman*, 229 Ill. 2d at 112.

¶ 77    Actions against State officials in their official capacities are treated differently. A lawsuit that makes a State official a defendant in his official capacity is "not a suit against the official but rather is a suit against the official's office. [Citation.] As such, it is no different from a suit against the State itself." *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989). See also, *e.g.*, *Smith v. Jones*, 113 Ill. 2d 126, 131 (1986) (the " 'official acts of State officers are in effect acts of the State itself' " (quoting *Sass*, 72 Ill. 2d at 492)); *Magna Trust Co.*, 234 Ill. App. 3d at 1070; *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992). It follows, therefore, that a lawsuit making a State official a defendant in his official capacity is subject to the Immunity Act.

¶ 78    There is, however, an exception to this rule, which this court has referred to as the "officer suit" exception. See *PHL, Inc. v. Pullman Bank & Trust Co.*, 216 Ill. 2d 250, 260-61 (2005). Under this exception, if an official-capacity suit seeks only to compel the State official to conform his or her future conduct to a nondiscretionary statutory or constitutional rule, the Immunity Act will not apply. *Ellis v. Board of Governors of State Colleges & Universities*, 102 Ill. 2d 387, 395 (1984) (when the plaintiff "seeks to enjoin a State officer from taking future actions in excess of his delegated authority, then the immunity prohibition does not pertain"); *Magna Trust Co.*, 234 Ill. App. 3d at 1070. The rationale given for this exception permitting prospective injunctive relief is that while a State official is violating a mandatory statutory or constitutional rule, that violation " 'strips [the] State officer of his official status *** [and] his conduct is not then regarded as the conduct of the State, nor is the action against him considered an action against the State.' " *PHL, Inc.*, 216 Ill. 2d at 261 (quoting *Moline Tool Co. v. Department of Revenue*, 410 Ill. 35, 37 (1951)). That is, the State official, although named as a defendant in his official capacity, is no longer considered the "State of Illinois." The official is therefore not

subject to the Immunity Act and may be enjoined to conform his or her future conduct to the law.

¶ 79 With the foregoing rules in mind, the defendants' contention that they fall within the scope of the Immunity Act and that the circuit court therefore properly dismissed Leetaru's complaint can be addressed. The two defendants, the University and Guenther, need to be considered separately.

¶ 80 *The University Is the "State of Illinois" Within the Meaning of the Immunity Act*

¶ 81 The majority begins its analysis by observing that Leetaru's complaint, which makes the University a defendant, does not assert any claim against the State "as such." *Supra* ¶ 43. The majority does not explain what legal significance, if any, the phrase "as such" is meant to have with respect to the University. When an institutional entity raises the Immunity Act as a defense to suit in circuit court, as was done in this case, the relevant question is whether the entity is an arm of the State and, therefore, entitled to invoke the Act. Answering that question should be the initial step in the analysis here. See, *e.g.*, *Association of Mid-Continent Universities v. Board of Trustees of Northeastern Illinois University*, 308 Ill. App. 3d 950, 953 (1999) ("in determining whether sovereign immunity applies, the analysis should focus first on whether an entity is considered an arm of the State").

¶ 82 The first case from this court to address whether an entity was an arm of the State for purposes of the Immunity Act was *Williams v. Medical Center Comm'n*, 60 Ill. 2d 389 (1975). In that case, this court considered whether a legislatively-created Medical Commission was part of the "State of Illinois" within the meaning of the Immunity Act by examining the Commission's various statutory characteristics. Although the Commission had been created as a body politic, with the power to sue and be sued, it was also expressly and implicitly characterized as an arm of the State in numerous statutory provisions, including the Court of Claims Act. That act referenced the Commission by name and required that actions sounding in tort against the Commission be brought in the Court of Claims. Based on this, as well as other various factors, the court concluded that the Commission was an arm of the State and therefore came within the terms of the Immunity Act. *Id*. at 393-94.

¶ 83    A year later, in *Kane v. Board of Governors of State Colleges & Universities*, 43 Ill. App. 3d 315 (1976), our appellate court considered whether the Board of Governors of State Colleges and Universities was an arm of the State. At that time, the Board of Governors was an entity which encompassed five of the State's public universities: Eastern Illinois University, Western Illinois University, Chicago State University, Northeastern Illinois University and Governors State University. Ill. Rev. Stat. 1973, ch. 144, ¶ 1001.[2] Applying the type of analysis undertaken in *Williams*, the *Kane* court concluded that the Board of Governors was the "State of Illinois" within the meaning of the Immunity Act. *Kane*, 43 Ill. App. 3d at 317-19.

¶ 84    Shortly after *Kane*, our appellate court held, on two occasions, that the University of Illinois is an arm of the State. See *Tanner v. Board of Trustees of the University of Illinois*, 48 Ill. App. 3d 680, 683-84 (1977); *Watson v. St. Annes Hospital*, 68 Ill. App. 3d 1048, 1051-52 (1979). The same result was also reached with respect to Southern Illinois University (*Hoffman v. Yack*, 57 Ill. App. 3d 744, 747 (1978)), and Northern Illinois University (*McGuire v. Board of Regents of Northern Illinois University*, 71 Ill. App. 3d 998, 1000 (1979)). See also *Liebman v. Board of Governors of State Colleges & Universities*, 79 Ill. App. 3d 89, 91-92 (1979) (holding that the Board of Governors was an arm of the State).

¶ 85    In 1984, in *Ellis v. Board of Governors of State Colleges & Universities*, 102 Ill. 2d 387 (1984), this court took up the question addressed in *Kane*, *i.e.*, whether the Board of Governors of State Colleges and Universities was an arm of the State. The court adopted the reasoning of *Kane in toto* and held that the Board of Governors was the "State of Illinois" within the meaning of the Immunity Act. In so holding, *Ellis* noted that a previous decision from this court, *People ex rel. Board of Trustees of the University of Illinois v. Barrett*, 382 Ill. 321, 343 (1943), had expressly concluded that the "University [of Illinois] was cloaked with sovereign immunity." *Ellis*, 102 Ill. 2d at 393.

¶ 86    Following *Ellis*, Illinois courts have unanimously concluded that our four-year, public universities—including the University of Illinois—are the State, for purposes of the Immunity Act. See *Schoeberlein v. Purdue University*, 129 Ill. 2d 372, 379-80 (1989) (recognizing that an action brought against a four-year Illinois public university would be subject to the Immunity Act); *Healy*, 133 Ill. 2d at 308

---

[2] Subsequent legislation divided the universities into separate entities governed similarly to the University of Illinois. See generally *Joseph Construction Co. v. Board of Trustees of Governors State University*, 2012 IL App (3d) 110379.

- 28 -

(noting that Northern Illinois University must "be considered a unit of State government"); *Management Ass'n of Illinois, Inc. v. Board of Regents of Northern Illinois University*, 248 Ill. App. 3d 599, 607 (1993); *Raymond v. Goetz*, 262 Ill. App. 3d 597, 605 (1994) ("The modern line of cases, decided since the enactment of the Immunity Act, is determinative and explicitly indicates the University [of Illinois] is an arm of the State."); *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d 897, 901 (1997); *Association of Mid-Continent Universities v. Board of Trustees of Northeastern Illinois University*, 308 Ill. App. 3d 950, 955-57 (1999); *Peters v. Board of Trustees of Southern Illinois University*, 351 Ill. App. 3d 1143, 1146-47 (2004); *Joseph Construction Co. v. Board of Trustees of Governors State University*, 2012 IL App (3d) 110379, ¶¶ 30-41; *Carmody v. Thompson*, 2012 IL App (4th) 120202, ¶ 20. See also, *e.g.*, *Kroll v. Board of Trustees of the University of Illinois*, 934 F.2d 904, 908 (7th Cir. 1991) (recognizing that the University is an arm of the State); *Cannon v. University of Health Sciences/The Chicago Medical School*, 710 F.2d 351, 356-57 (N.D. Ill. 1983); *Harvis v. Board of Trustees of the University of Illinois*, 744 F. Supp. 825, 827 (N.D. Ill. 1990); *Bruno v. University of Illinois*, 62 Ill. Ct. Cl. 194 (2009) (treating breach of contract action against the University as one against the State); *Kafka v. State*, 35 Ill. Ct. Cl. 737 (1982) (same).

¶ 87    Under well-established case law, the University is an arm of the State. Leetaru's complaint therefore makes the State of Illinois a defendant in circuit court.

¶ 88    *The University Is Subject to the Immunity Act, Regardless of the Nature of the Relief Sought*

¶ 89    Leetaru concedes that the University is the "State of Illinois" for purposes of the Immunity Act. Nevertheless, Leetaru contends that his suit may proceed in circuit court against the University under a general "prospective injunctive relief" exception to the Immunity Act. This exception, Leetaru maintains, permits lawsuits which make an arm of the State a defendant, if the plaintiff seeks only prospective injunctive relief. In effect, Leetaru's contention is that the officer suit exception, which permits official-capacity suits for prospective injunctive relief against State officials, also applies to arms of the State such as the University here.

¶ 90 In support of this contention, Leetaru relies on this court's decision in *Landfill, Inc. v. Pollution Control Board*, 74 Ill. 2d 541 (1978), and appellate cases which have followed that decision (see, *e.g.*, *Rockford Memorial Hospital v. Department of Human Rights*, 272 Ill. App. 3d 751, 755 (1995); *Illinois State Employees Ass'n v. Department of Children & Family Services*, 178 Ill. App. 3d 712, 717 (1989)). In *Landfill*, the plaintiff filed a complaint against the Pollution Control Board in circuit court seeking both a declaration that a certain procedural rule adopted by the Board was not authorized by the Environmental Protection Act and an order enjoining the Board from conducting any further proceedings under the rule. This court held that the rule was unauthorized. In the course of reaching that conclusion, the court made the following statement:

"The Board's contention, advanced for the first time on oral argument, that the action against the Board was barred by sovereign immunity, is also without merit. Landfill is not seeking to enforce a present claim against the State, but, rather, seeks a declaration that the Board is taking actions in excess of its delegated authority. Such an action does not contravene principles of sovereign immunity. See *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 548; see also *Moline Tool Co. v. Department of Revenue* (1951), 410 Ill. 35, 38." *Landfill*, 74 Ill. 2d at 552.

This language, Leetaru contends, supports his position because, in his view, he is not seeking to enforce a "present claim," *i.e.*, a remedy for past wrongs, against defendants. Instead, he is seeking only prospective injunctive relief to halt any further investigative proceedings by the University. Therefore, according to Leetaru, his suit against the University may proceed in circuit court.

¶ 91 To the extent that *Landfill* is read as holding that any direct action against an arm of the State is permissible in circuit court so long as only prospective injunctive relief from *ultra vires* actions is sought, it is questionable authority. *Landfill*'s analysis consisted of two sentences on an unbriefed issue. In support, *Landfill* cited to *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540 (1977). That case involved a lawsuit brought against a State official in his official capacity and whether the officer suit exception was applicable. *Id.* at 548. *Landfill* did not explain why an exception which originated in the context of official-capacity suits was appropriate in a lawsuit brought against an arm of the State. The second case cited by *Landfill*, *Moline Tool Co. v. Department of Revenue*, 410 Ill. 35 (1951), held only that administrative review in circuit court of an agency decision that had

- 30 -

the force of a judicial determination did not violate principles of sovereign immunity. *Moline Tool* did not hold that direct actions against arms of the State were permissible in circuit court so long as only prospective injunctive relief is sought. Indeed, *Moline Tool* expressly observed that there is a "a real difference between an original action against the State or one of its officers and agencies, and a proceeding to review the determination of an agency of State government which, itself, has the force of a judicial determination." *Id.* at 38.

¶ 92 Eight years after *Landfill*, in *Smith v. Jones*, 113 Ill. 2d 126 (1986), this court reached the opposite conclusion from *Landfill* and held that a direct action against an arm of the State is prohibited in circuit court, regardless of the nature of the relief sought. In *Smith*, this court considered a lawsuit brought by lottery ticket holders requesting declaratory and injunctive relief against the Illinois State Lottery and its director. This court acknowledged that the director could potentially be subject to the officer suit exception and the plaintiffs' complaint with respect to the director had to be addressed in that light. *Id.* at 131-33. However, that was not the case with respect to the Illinois State Lottery, which was a division of the Department of Revenue and, therefore, an arm of the State. The court stated: "Of course, because of sovereign immunity the State or a department of the State can never be a proper party defendant in an action brought directly in the circuit court." *Id.* at 132. Notably, *Smith* did not mention *Landfill*. The cases are in conflict.

¶ 93 The majority accepts *Landfill* as providing the correct statement of the law (*supra* ¶ 44), and leaves unresolved the conflict between *Smith* and *Landfill*—presumably because the defendants have not cited *Smith* or argued for its application here. I would address the conflict and resolve it in favor of *Smith*.

¶ 94 The rationale behind allowing lawsuits which seek prospective injunctive relief from *ultra vires* actions is that, while acting without statutory or constitutional authority, a State official is "stripped" of his official status and " 'his conduct is not then regarded as the conduct of the State, nor is the action against him considered an action against the State.' " *PHL, Inc.*, 216 Ill. 2d at 261 (quoting *Moline Tool Co.*, 410 Ill. at 37). Because it is the State official who is stripped of official status and not the arm of the State to which the official belongs, it necessarily follows that it is the official who must be made a defendant. And this is precisely how the rule has always been stated. As the majority itself explains, " ' "[t]he presumption obtains that the State, or a department thereof, will not, and does not, violate the constitution and laws of the State, but that such violation, if it occurs, is by a State

- 31 -

officer or the head of a department of the State *and such officer or head may be restrained by a proper action instituted by a citizen*." ' " (Emphasis added.) *Supra* ¶ 48 (quoting *City of Springfield v. Allphin*, 74 Ill. 2d 117, 124 (1978), quoting *Schwing v. Miles*, 367 Ill. 436, 441-42 (1937)). See also, *e.g.*, *PHL, Inc.*, 216 Ill. 2d at 261; *Herget National Bank of Pekin v. Kenney*, 105 Ill. 2d 405, 411 (1985); *County of Cook v. Ogilvie*, 50 Ill. 2d 379, 383 (1972); *Owens v. Green*, 400 Ill. 380, 409 (1948); *Burke v. Snively*, 208 Ill. 328, 337 (1904). *Smith*'s holding is completely consistent with this rule.

¶ 95        And *Smith* is not the only case to have recognized that the relevant State official, and not the arm of the State, must be made the defendant when a plaintiff seeks prospective injunctive relief from *ultra vires* actions. Numerous Illinois decisions so hold. See, *e.g.*, *Noorman v. Department of Public Works & Buildings*, 366 Ill. 216 (1937) (dismissing the state Department of Public Works in a suit seeking prospective injunctive relief but acknowledging that the director of the Department was subject to the officer-suit exception); *Monroe v. Collins*, 393 Ill. 553 (1946) (holding that the state Department of Revenue had to be dismissed from a suit seeking prospective injunctive relief but that the director of the Department was subject to the officer-suit exception); *Posinski v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 376 Ill. 346 (1941) (dismissing the state Department of Public Works from a suit seeking prospective injunctive relief but addressing the applicability of the officer-suit exception to the director); *Westshire Retirement & Healthcare Center v. Department of Public Aid*, 276 Ill. App. 3d 514, 521-22 (1995) (rejecting the plaintiff's claim for injunctive relief against the Illinois Department of Public Aid and noting that "the attempt to enjoin an entire department of the State evinces an intent to control the actions of the State"); *Local 3236 of the Illinois Federation of State Office Educators v. Illinois State Board of Education*, 121 Ill. App. 3d 160, 164 (1984); *Gordon v. Department of Transportation*, 109 Ill. App. 3d 1071, 1074-75 (1982).

¶ 96        Other jurisdictions have reached the same conclusion. The Supreme Court of Texas, for example, has held that, because lawsuits seeking prospective injunctive relief from *ultra vires* actions are "derive[d] from the premise that the 'acts of officials which are not lawfully authorized are not acts of the State,' [citation] it follows that these suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372-73 (Tex. 2009). See also, *e.g.*, *Doe v. Board of Regents of the University of Nebraska*, 788 N.W.2d 264, 292 (Neb. 2010);

*Ex parte Alabama Department of Transportation*, 978 So. 2d 17, 22-23 (Ala. 2007).

¶ 97    Federal courts, in determining what constitutes an action against a state for purposes of immunity under the eleventh amendment, also uniformly hold the same.[3] See, *e.g.*, *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (" '[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.' [Citation.] This bar exists whether the relief sought is legal or equitable."); 13 Charles Alan Wright *et al.*, Federal Practice and Procedure § 3524.3 n.53 (3d ed. 2008) (collecting cases). Indeed, the Seventh Circuit has held that under the eleventh amendment, in the absence of consent, a suit may not be brought directly against the University of Illinois, regardless of the nature of the relief sought. *Kroll v. Board of Trustees of the University of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991).

¶ 98    Further, the Supreme Court has held that when a state official is made a defendant in a suit seeking prospective injunctive relief along with an arm of the State, the State entity must be dismissed. *Alabama v. Pugh*, 438 U.S. 781 (1978). In reaching this result, the Court emphasized that the question of who or what entity is made a party defendant is "not merely academic." *Id*. at 782. As the Court explained, a state "has an interest in being dismissed from [an] action in order to eliminate the danger of being held in contempt if it should fail to comply with the mandatory injunction." *Id.* The same concern is present here.

¶ 99    Consistent with *Smith* and the clear weight of authority, I would hold that in the absence of statutory consent, an arm of the State, such as the University here, may not be sued directly in circuit court, regardless of the nature of the relief sought. In the absence of consent, an arm of the State may be sued only through its officials.

¶ 100    *The University of Illinois Act Does Not Constitute a Clear and Unequivocal Consent to Suit in the Circuit Court for the Action at Issue Here*

¶ 101    Leetaru also maintains, however, that even if there is no general exception to the Immunity Act applicable to the University, there is a clear consent to suit in the

---

[3]This court often looks for guidance to federal decisions defining the scope of eleventh amendment immunity when determining whether an action is one against the State. See, *e.g.*, *PHL, Inc.*, 216 Ill. 2d at 261 (citing *Ex Parte Young*, 209 U.S. 123 (1908)).

University of Illinois Act. 110 ILCS 305/0.01 *et seq*. (West 2012). The appellate court below rejected this argument.

¶ 102    Section 1 of the University of Illinois Act provides:

"§ 1. The Board of Trustees of the University of Illinois shall be a body corporate and politic, and by that name and style shall have perpetual succession, have power to contract and be contracted with, to sue and be sued, provided that any suit against the Board based upon a claim sounding in tort must be filed in the Court of Claims, to plead and be impleaded, to acquire, hold, and convey real and personal property; to have and use a common seal, and to alter the same at pleasure; to make and establish by-laws, and to alter or repeal the same as they shall deem necessary, for the management or government, in all its various departments and relations, of the University of Illinois, for the organization and endowment of which provision is made by this act." 110 ILCS 305/1 (West 2012).

¶ 103    Leetaru focuses, in part, on the "sue and be sued" language in this provision. According to Leetaru, this language constitutes a clear and unequivocal waiver of the University's statutory immunity for any claims other than tort claims. Since his complaint does not sound in tort, Leetaru contends that it may properly be brought in circuit court. I disagree.

¶ 104    Appellate court decisions have examined at length the question of whether our public universities' enabling acts, including the University of Illinois Act, constitute waivers of the universities' sovereign immunity. See *Raymond v. Goetz*, 262 Ill. App. 3d 597 (1994) (and authorities discussed therein); *Joseph Construction Co. v. Board of Trustees of Governors State University*, 2012 IL App (3d) 110379. These decisions have concluded that "since the enactment of legislative sovereign immunity, the focus of the determination of whether an entity may be sued in the circuit court is upon whether the entity is an arm of the State based upon its characteristics, not the terms of the entity's enabling legislation." *Raymond*, 262 Ill. App. 3d at 603-04. That is, the university enabling statutes, like the one at issue here, do not constitute a waiver of immunity under the Immunity Act.

¶ 105    Leetaru does not directly challenge these decisions. Instead, he contends they are distinguishable. Leetaru notes that *Raymond* and *Joseph Construction Co.*, were contract cases and, further, that the Court of Claims expressly states that

actions for breach of contract brought against the State must be heard in that tribunal. Leetaru points out, however, that the Court of Claims Act says nothing about complaints seeking prospective injunctive relief. Leetaru notes that in *City of Chicago v. Board of Trustees of the University of Illinois*, 293 Ill. App. 3d 897, 903 (1997), the appellate court held that, because "[n]o provision" of the Court of Claims Act required that a complaint seeking declaratory relief against the State had to be filed in the Court of Claims, such a complaint could necessarily proceed in circuit court.[4] Using similar logic, Leetaru contends that his suit seeking injunctive relief may be heard in circuit court.

¶ 106    Leetaru's argument misapprehends the nature of the Court of Claims Act. Immunity from suit in the circuit courts is established by the Immunity Act, not the Court of Claims Act. See, *e.g.*, *Brandon v. Bonell*, 368 Ill. App. 3d 492, 510 (2006) ("the State Lawsuit Immunity Act, not the Court of Claims Act, is determinative of whether sovereign immunity applies to a State entity"); *Association of Mid-Continent Universities*, 308 Ill. App. 3d at 954. The Court of Claims Act is an exception to sovereign immunity. It is a consent by the State to be sued in the Court of Claims for the various causes of action set forth in that act. The fact that the State has not, through legislative enactment, expressly consented to claims seeking injunctive relief in the Court of Claims does not mean that immunity for those claims does not exist under the Immunity Act.

¶ 107    The University of Illinois is an arm of the State and thus falls within the plain meaning of the Immunity Act. Pursuant to *Raymond* and *Joseph Construction Co.*, no provision of the University of Illinois Act provides a clear and unequivocal waiver to the type of action at issue here. I would therefore affirm the judgment of the circuit court dismissing the University from this action.

¶ 108                    *Leetaru's Claims Against Guenther Do Not Fall Within the*
                                          *Officer Suit Exception*

¶ 109    Leetaru's suit also names as a defendant Howard R. Guenther, in his official capacity as Associate Vice Chancellor for Research at the University. Leetaru does not dispute that Guenther is a State official. Thus, because the complaint makes

_____

[4] Of note, the Court of Claims, while declining to enter injunctive relief, has stated that it has the power to enter declaratory relief. *Ace Coffee Bar, Inc. v. University of Illinois*, 51 Ill. Ct. Cl. 395, 397-99 (1999) ("This Court can grant declarations in appropriate cases.").

Guenther a defendant in his official capacity, the suit against him is "a suit against the State itself." *Magna Trust Co.*, 234 Ill. App. 3d at 1070. Leetaru maintains, however, that the officer suit exception is applicable here.

¶ 110 The officer suit exception (in federal courts, the *Ex parte Young* doctrine), permits an official-capacity lawsuit to enjoin " 'a State officer from taking future actions in excess of his delegated authority.' " (Emphasis omitted.) *PHL, Inc.*, 216 Ill. 2d at 268 (quoting *Ellis*, 102 Ill. 2d at 395). See also, *e.g.*, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996) (a suit may be brought against "a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law' "). To fall within this *ultra vires* exception, the suit must not contest a state official's exercise of discretion, but rather must allege that the official acted without legal authority. *PHL, Inc.*, 216 Ill. 2d at 268 (quoting *Ellis*, 102 Ill. 2d at 395).

¶ 111 Retroactive relief for past violations of the law, including monetary compensation, is not permitted under the officer suit exception. See *Green v. Mansour*, 474 U.S. 64, 68 (1985); *Quern v. Jordan*, 440 U.S. 332, 346-49 (1979); *Edelman v. Jordan*, 415 U.S. 651, 664-71 (1974). By limiting the available relief to prospective injunctions, the officer suit exception minimizes the encroachment into the interests of the State while, at the same time, permitting the enforcement of legal norms. *Senn Park Nursing Center v. Miller*, 104 Ill. 2d 169, 188 (1984) ("[W]here the defendant officer act[s] in excess of his statutory authority, the rights of the plaintiffs to be free from the consequences of his action outweigh the interest of the State which is served by the sovereign immunity doctrine."); *Moline Tool Co.*, 410 Ill. at 37 (not all suits against state officers are barred because "[s]uch a holding would have blunted the effectiveness of many constitutional guaranties by preventing their judicial enforcement").

¶ 112 Because the officer suit exception is limited to prospective relief, the complaint must allege an ongoing violation of law. See, *e.g.*, *DeBauche v. Trani*, 191 F.3d 499, 504-05 (4th Cir. 1999) (the exception "applies only when there is an ongoing violation of federal law that can be cured by prospective relief. It does not apply when the alleged violation of federal law occurred entirely in the past"); 13 Charles Alan Wright *et al.*, Federal Practice and Procedure § 3524.3 n.62 (3d ed. 2008) (collecting cases). If the alleged violation of law is completed, the only remedy available would be retrospective compensatory damages which are not permitted under the exception. On the other hand, if the alleged violation has not yet occurred,

the issue is not ripe. See *Bio-Medical Laboratories*, 68 Ill. 2d at 546. Thus, for a plaintiff to successfully invoke the officer suit exception the plaintiff must allege an ongoing violation of law and it must be possible to stop that violation through the issuance of an injunction. See *Verizon Maryland Inc. v. Public Service Comm'n*, 535 U.S. 635, 645 (2002) ("In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' [Citation.]").

¶ 113        Leetaru's complaint fails to invoke the officer suit exception because it alleges only past wrongdoing by Guenther during stages one and two of the University's investigation. For example, Leetaru alleges that Guenther drafted the stage two inquiry report, which should have been prepared by the inquiry team. This is a past violation, not an ongoing violation that can be cured by prospective relief. Indeed, Leetaru does not allege any ongoing statutory or constitutional violation that can be corrected by prospective relief. See *supra* ¶ 34. Further, if there were any doubt that Leetaru's allegations regarding the handling of stages one and two are all assertions of past wrongdoing, it was resolved at oral argument. There counsel for defendants informed this court that "this investigation has been completed now, and they're in the penalty phase of it."[5]

¶ 114        To be sure, Leetaru's complaint does pray for prospective injunctive relief. Count I of Leetaru's complaint concludes by stating:

> "WHEREFORE, the Plaintiff, KALEV LEETARU, prays for a Preliminary Injunction to restrain the University of Illinois and Howard Guenther in his official capacity from proceeding with the Investigation based upon all of the allegations set forth herein, and for his costs of suit."

Count II concludes by stating:

> "WHEREFORE, the Plaintiff, KALEV LEETARU, prays for a Permanent Injunction to restrain the University of Illinois and Howard Guenther in his

---

[5]In light of counsel's statement it is likely that it is no longer possible to grant plaintiff any prospective injunctive relief and that this case is therefore moot. The majority, if it so chose, could ask the parties to address the issue through supplemental briefing. See, *e.g.*, *In re Marriage of Donald B.*, 2014 IL 115463, ¶ 20. However, the majority has chosen not to acknowledge counsel's statement, leaving the matter to be raised on remand.

official capacity from proceeding with the Investigation based upon all of the allegations set forth herein, and for his costs of suit."

In short, in the words of Leetaru's complaint, he is seeking "to have the Investigation stopped and the University enjoined from continuing the process against him."

¶ 115    However, "[s]imply asking for injunctive relief and not damages does not clear the path for a suit." (Emphasis omitted.) *Ulaleo v. Paty*, 902 F.2d 1395, 1399 (9th Cir. 1990). The official conduct that the plaintiff seeks to stop must itself be unlawful. *PHL, Inc.*, 216 Ill. 2d at 268 (the officer suit exception applies to stop " 'a State officer from taking future actions in excess of his delegated authority' " (emphasis omitted) (quoting *Ellis*, 102 Ill. 2d at 395)).

¶ 116    In this case, the "future action" that Leetrau wants Guenther to stop is any further investigation into the alleged research misconduct. However, there is no statutory, administrative or constitutional rule which prohibits Guenther from conducting such an investigation. If, for example, there were a mandatory statute or regulation which stated that University officials are prohibited from investigating research misconduct and that such investigations must be conducted by another entity, then Leetaru's argument would be persuasive. But there is no such rule. Indeed, as the majority acknowledges, "Leetaru does not question the right of defendants to investigate research misconduct by graduate students at the University of Illinois." *Supra* ¶ 49. Leetaru, in short, is not seeking to stop an unauthorized action of a State official. Quite the contrary, Leetaru is seeking to stop something that is expressly permitted. The officer suit exception therefore does not apply. See, *e.g.*, *Betts v. Department of Revenue*, 78 Ill. App. 3d 102, 108 (1979) (plaintiffs' complaint properly dismissed under Immunity Act because it was "not directed towards curbing unconstitutional or illegal acts by the defendants; if granted, this injunctive relief would curtail even entirely legal and proper prosecutions or investigations").

¶ 117    The majority attempts to get around this problem by rewriting plaintiff's complaint. At the outset of its opinion, the majority acknowledges, correctly, that Leetaru's complaint "seeks to halt the proceedings." *Supra* ¶ 1. Later, however, the majority asserts that Leetaru is not actually seeking to have the investigation stopped. Instead, the majority explains, Leetaru is only seeking to have defendants "adhere to the policies and procedures promulgated by the University" (*supra* ¶ 49)

- 38 -

as they move forward with the disciplinary process (*supra* ¶ 51). Amended in this way, according to the majority, the complaint may proceed in circuit court.

¶ 118     There are at least two problems with this reasoning. First, the majority makes no attempt to explain why it is appropriate to amend Leetaru's complaint *sua sponte* to alter the relief sought or why it is fair to defendants to permit such an amendment at this late date. Because such substantive amendments are generally prohibited on appeal, this is clear error. See *Sylvester v. Chicago Park District*, 179 Ill. 2d 500, 511 (1997) (Supreme Court Rule 362, which addresses amendment of pleadings in a reviewing court, does not permit new issues to be raised on appeal); *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 14 ("A complaint cannot be amended after final judgment in order to add new claims and theories or to correct other deficiencies.").

¶ 119     Second, even if it were appropriate to amend Leetaru's complaint as the majority has done, the officer suit exception would still be inapplicable because the complaint does not allege an ongoing violation of law. As noted, every violation of policies and bylaws alleged by Leetaru occurred in the past. These are the only allegedly unlawful actions identified by the majority. Pointing to the future stages of the University's investigation is of no help since the majority does not allege that any policy or bylaw will be violated during these future stages or that defendants have threatened to commit any future violations. Therefore, any injunctive relief would necessarily be premature. See *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995) (the fact that a plaintiff alleges past injury " 'does nothing to establish a real and immediate threat that he would again' suffer similar injury in the future" warranting injunctive relief (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983))); *Bio-Medical Laboratories*, 68 Ill. 2d at 546. This is why the officer suit exception requires an allegation of an ongoing violation of law.

¶ 120     To put the point in more concrete terms, assume that, following remand to the circuit court, Leetaru proves that the University's Policy and Procedures and Bylaws are not simply internal guidelines but are legally enforceable rules and, in addition, proves that the University and Guenther violated those rules as alleged in the complaint. What injunctive order would be entered by the circuit court? The court could not order the University to begin the investigation again. That would be impermissible retrospective relief. Nor could the court enter any order regarding future conduct because Leetaru has not alleged any ongoing violations of law. The majority's reasoning would require the circuit court to enter an order directing

defendants to conform their conduct to rules that have not yet been violated or threatened to be violated. This is not what is intended under the officer suit exception.

¶ 121     To come within the officer suit exception, a plaintiff must assert both an ongoing legal violation and the availability of truly prospective relief. Leetaru's complaint does not meet these requirements. Therefore, the officer suit exception is inapplicable.

¶ 122                                    *Lack of Remedy*

¶ 123     Leetaru acknowledges that if he can establish that the University's Policy and Procedures and Bylaws are legally enforceable rules, he may seek relief in the Court of Claims for any monetary damages caused by defendants as a result of their conduct. However, Leetaru maintains that this is inadequate since what he is seeking is injunctive relief to stop the University and Guenther from proceeding any further with the investigation and injunctive relief has, to date, not been available in the Court of Claims. Therefore, Leetaru asserts, he must be permitted to go forward with his complaint in the circuit court. I disagree. As Justice Harrison, then on the appellate court, stated:

> "[Plaintiff] protests that it should nevertheless be allowed to proceed in circuit court because the Court of Claims has no authority to grant the remedy of specific performance, which is what it seeks. A similar argument was expressly considered and rejected by our supreme court in *Ellis v. Board of Governors* (1984), 102 Ill. 2d 387, 395 ***. In that case, the court held that where, as here, a plaintiff seeks redress from the State for a wrong which has already occurred, he will only be permitted to proceed in the Court of Claims, even if he will thereby lose the option of obtaining injunctive relief. While the [plaintiff] may regard this limitation as unfair, we can only refer to our supreme court's observation that ' "[i]f the inequities inherent in the doctrine of sovereign immunity are to be remedied, it is for the legislature and not this court to act." ' *Patzner v. Baise* (1990), 133 Ill. 2d 540, 548 ***, quoting *S.J. Groves & Sons Co. v. State* (1982), 93 Ill. 2d 397, 407 ***." *Magna Trust Co.*, 234 Ill. App. 3d at 1071-72.

¶ 124                         *Special Sovereignty Issues*

¶ 125        Finally, even if a lawsuit properly invokes the officer suit exception, sovereign immunity may still bar the suit if the requested relief invades "special sovereignty issues." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281-83 (1997) (discussing *Ex parte Young*). Defendants contend that such issues are at stake here. Defendants maintain that allowing Leetaru's lawsuit to proceed in circuit court would result in judicial interference in the academic freedom of the University, an area in which courts have traditionally been reluctant to interfere. See, *e.g.*, *Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) ("academic freedom includes the authority of the university to manage an academic community and evaluate teaching and scholarship free from interference by other units of government, including the courts"); Brian A. Snow & William E. Thro, *The Significance of Blackstone's Understanding of Sovereign Immunity for America's Public Institutions of Higher Education*, 28 J.C. & U.L. 97, 125 (2001) (observing that "the academic freedom of a state university" is arguably a special sovereignty issue). Therefore, according to defendants, the officer suit exception should not apply.

¶ 126        Because I have concluded that the officer suit exception is inapplicable in this case, it is not necessary for me to address this argument. The majority, however, having concluded that the exception applies, does need to address it. The majority opinion does not do so and, therefore, is incomplete.

¶ 127        For the foregoing reasons, I respectfully dissent.


¶ 128        JUSTICES FREEMAN and THEIS join in this dissent.